Willie Jasper **DARDEN**, Petitioner,

v.

Louie L. **WAINWRIGHT**, Secretary of Department of Offender Rehabilitation, State of Florida, Respondent.

No. 79–566 Civ–T–H.

United States District Court,
M. D. Florida,
Tampa Division.

May 8, 1981.

Robert Augustus Harper, Jr., Gainesville, Fla., for petitioner.

Richard W. Prospect, Asst. Atty. Gen., Daytona Beach, Fla., for respondent.

## MEMORANDUM OPINION

HODGES, District Judge.

Willie Jasper Darden, a Florida prisoner under sentence of death, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His petition was referred to a United States Magistrate who conducted an evidentiary hearing and subsequently rendered a Report and Recommendation that

relief be granted on two grounds. The parties filed their respective objections to the Magistrate's Report, and a hearing was then conducted before me in order to facilitate the de novo determination required by 28 U.S.C. § 636(b)(1)(B) and (C). See also, Rule 6.02, M.D.Fla. Rules, and Rule 8(b)(4), Rules Governing § 2254 Cases. Upon full consideration of the Magistrate's Report, the record of the proceedings he conducted, and the case in general, I am convinced that the infirmities in the Petitioner's trial do not assume constitutional dimensions and that his petition should be denied.

## I Background

Carl's Furniture Store was located in Lakeland, Florida. It was a small retail store dealing in used furniture and household appliances. The business was owned by Mrs. Helen Turman and her husband Carl. Their home was adjacent to the store, and Mrs. Turman managed the business alone while Mr. Turman held employment elsewhere.

On the evening of September 8, 1973, Mrs. Turman was the victim of an armed robbery in her store. While that crime was in progress Mr. Turman happened to enter upon the scene. He was followed a few minutes later by Phillip Arnold, a teenaged neighbor. What happened next was succinctly described by the Supreme Court of Florida in the following terms:[1]

> The record shows that Appellant first robbed Mrs. Helen Turman and that, when her unarmed husband Carl started to enter the store, Appellant shot him between the eyes scattering blood and brains. As a sixteen year old boy, Phillip Arnold, tried to aid the wounded man, Appellant shot him in his mouth, neck, and side, leaving permanent injuries, including a bullet still in his neck at time of trial. While her bleeding husband lay in a rainstorm at the door, Appellant tried

to force Mrs. Turman to commit an unnatural sex act upon him at gun point. She refused, and after shooting the boy Appellant left the area.

Darden was arrested and subsequently indicted for first degree murder (of Mr. Turman), robbery (of Mrs. Turman), and assault with intent to commit murder (upon Phillip Arnold). Following a change of venue to another county, the trial was held in January, 1974. In addition to circumstantial evidence against him, Darden was positively identified during the trial by Mrs. Turman and Phillip Arnold. His defense was alibi, and he was the sole witness to testify in his behalf.[2]

The jury found the Petitioner guilty as charged; and, following the second phase of the bifurcated trial required by Florida Statute 921.141—the constitutionality of which has been settled by *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)—the jury recommended that Darden be sentenced to death. The trial judge then entered his independent findings concerning aggravating and mitigating circumstances, pursuant to the statute, and followed the jury's recommendation by imposing a sentence of death.

An appeal was taken to the Supreme Court of Florida which affirmed the conviction and the sentence. *Darden v. State*, 329 So.2d 287 (Fla.1976). A petition for a writ of certiorari was granted by the Supreme Court of the United States on November 1, 1976. *Darden v. Florida*, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 282 (1976). By order entered January 10, 1977, the Court limited the issues to be considered to the one "... dealing with whether the prosecution's summation to the jury in the circumstances of this case deprived the petitioner of due process of law." 429 U.S. 1036, 97 S.Ct. 729, 50 L.Ed.2d 747 (1977). Thereafter, on

---

1. *Darden v. State*, 329 So.2d 287, 290 (Fla. 1976). The Magistrate's Report and Recommendation contains a more detailed description of the facts.

2. The Petitioner thus gained a procedural advantage afforded by the Florida Rule that "...

a defendant offering no testimony in his own behalf, except his own, shall be entitled to the concluding argument before the jury." Rule 3.250, Fla.Rules of Criminal Procedure, 34 F.S.A. 5 (1975).

April 19, 1977, following oral argument, the Court entered an order dismissing the writ of certiorari "as improvidently granted." 430 U.S. 704, 97 S.Ct. 1671, 51 L.Ed.2d 751 (1977). The Petitioner then returned to the State Courts [3] and, ultimately, to this Court seeking habeas relief after the Governor had issued a death warrant.

The Magistrate's Report recites twenty five constitutional claims being asserted by the Petitioner, but only two were found to have merit: (1) the claim concerning the prosecution's closing argument; and (2) the claim concerning *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

## II The Prosecution's Closing Argument

(a) *The Supreme Court's grant of certiorari.* The principal issue raised during the Petitioner's direct appeal from his conviction—or, at least, the principal issue addressed by the Supreme Court of Florida in disposing of that appeal—concerned the inflammatory nature of the prosecution's closing argument to the jury at trial; and, as previously noted, the Supreme Court of the United States initially granted certiorari to consider that very issue. The writ was then discharged, after oral argument, as having been improvidently granted. The Magistrate did not consider or discuss the effect of the Supreme Court proceeding, and the parties have cited no authority on that point.

It is a well known rule, of course, that denial of a petition for a writ of certiorari by the Supreme Court does not constitute an adjudication.[4] But does the same result obtain upon collateral proceedings in the same case when certiorari to review a precisely articulated issue has been granted, not denied, and the writ is then subsequently discharged after oral argument? One might well suppose, at least with respect to the parties in such a case, that the discharge of the writ constituted a sufficient adjudication to preclude relitigation of that

issue in collateral proceedings under 28 U.S.C. § 2254 unless the order discharging the writ expressly preserved the question. See, for example, *Smith v. Mississippi*, 373 U.S. 238, 239, 83 S.Ct. 1265, 1266, 10 L.Ed.2d 321 (1963), in which the order discharging a writ previously granted specifically provided that such disposition was "without prejudice to an application for federal habeas corpus relief under 28 U.S.C. § 2241 after exhaustion of any state remedies still open ..." C.f., *Shippy v. Estelle*, 440 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1979), and *Jurek v. Estelle*, 430 U.S. 951, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977), in which mere denials of petitions for certiorari contained similar provisions concerning habeas relief.

█ It does not appear, however, that the Supreme Court has delineated any distinction between the adjudicative effect of a denial and a discharge of a writ of certiorari; and, indeed, in at least one decision the Court declared that the two forms of disposition have the same inconclusive result. *Hughes Tool Company v. Trans World Airlines, Inc.*, 409 U.S. 363, 365, 93 S.Ct. 647, 650, n.1, 34 L.Ed.2d 577 (1973). See also, *Miller v. Carter*, 434 F.2d 824 (9th Cir. 1970), cert. denied, 402 U.S. 972, 91 S.Ct. 1658, 29 L.Ed.2d 137 (1971). Accordingly, until the Supreme Court holds otherwise, this Court cannot dispose of the claim concerning the prosecutor's closing argument on the ground of a prior federal adjudication inherent in the Supreme Court's discharge of a writ previously issued to consider that claim.

█ (b) *Wainwright v. Sykes and the lack of contemporaneous objection.* There is a second preliminary issue which must be resolved before the constitutional propriety of the prosecutor's argument can be considered on its merits. The State contends, pursuant to the decision in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), that the Petitioner waived and is now precluded from asserting the claim be-

---

**3.** No issue is raised concerning exhaustion of state remedies, pursuant to 28 U.S.C. § 2254, with respect to any of the issues articulated in the Magistrate's Report.

**4.** *Brown v. Allen*, 344 U.S. 443, 489–497, 73 S.Ct. 397, 437–441, 97 L.Ed. 469 (1953).

cause he did not make a timely objection during the trial as necessitated by Florida's contemporaneous objection requirement, and he has not demonstrated "cause" and "prejudice" with respect to that failure. There is, however, an established exception to this application of *Wainwright v. Sykes.* When the State Court does not rely upon or enforce its contemporaneous objection requirement as a waiver, and proceeds to adjudicate the claim on its merits, then the federal habeas court should also reach and decide the constitutional issue presented. *Moran v. Estelle,* 607 F.2d 1140, 1141–42 (5th Cir. 1979); *Thompson v. Estelle,* 642 F.2d 996 (5th Cir. 1981). See also, *County Court of Ulster County v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

The difficulty presented by this case arises from the fact that the Supreme Court of Florida apparently disposed of the Petitioner's direct appeal on both grounds, alternatively. It first confronted and decided the fair trial issue concerning the prosecutor's argument, and then held, in the final paragraph of its opinion, that the lack of contemporaneous objection afforded an "additional" basis for denying relief, citing by footnote reference its decision in *State v. Jones,* 204 So.2d 515 (Fla.1967).[5]

*Ratcliff v. Estelle,* 597 F.2d 474 (5th Cir. 1979), cert. denied, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979), presented a similar problem. The underlying issue concerned the petitioner's claim that blacks had been systematically excluded from the grand jury which indicted him. He had not objected at the time of trial and first raised the issue in post-conviction habeas proceedings in the state courts. The state trial Court held that the claim had been waived by failure to make timely objection, but also held, secondarily, that the claim lacked merit in any event. On appeal of that decision the state court of appeal merely adopted the order of the trial Court. The federal district court then denied a § 2254 petition and the case made its way to the Fifth Circuit. The Court of Appeals began its opinion by postulating the issue as follows (597 F.2d at 475–476):

> If a state court finds that a procedural default forecloses a convicted defendant's right to challenge collaterally the composition of the grand jury which indicted him, but then proceeds to consider and deny the challenge on the merits, must a federal court deny habeas corpus relief under the contemporaneous objection rule, without reaching the merits of the constitutional attack? We agree with the district court that it must.

If that resolution of the problem constituted the entirety of the Fifth Circuit's decision it would clearly be dispositive of this case; but the reasons given later in the Court's opinion cast doubt upon that conclusion. The Court said (597 F.2d at 478):

> Without written order the Texas Court of Criminal Appeals denied petitioner's application based on the findings of the trial court.

> It is fair to assume that the appellate court applied the procedural default rule. First, the language in the trial court opinion regarding procedural default is absolute and there is no subsequent language which would qualify or compromise it. *Second it is well settled that a court will not reach a constitutional question if it can rest its decision on nonconstitutional grounds.* Third, there is no question that the trial court correctly applied Texas law on the procedural issue.

In *State v. Jones,* a 1967 decision cited in footnote 4, the Court "recanted" an exception under which improper prosecutorial argument had been reviewed on appeal in some prior cases despite the lack of objection, and held that "... henceforth [the Court] will review challenged argument of prosecutors only when an objection is timely made." 204 So.2d at 519.

---

**5.** The final paragraph of the *Darden* opinion stated (329 So.2d at 291):

> Additionally, Appellant admits that his attorney voiced but a single objection to the prosecutor's closing arguments, that it was not directed to any of the allegedly inflammatory matter, and that his attorney waited until the fifth occasion to object at all. This Court has held that a prosecutor's challenged argument will be reviewed on appeal only when a timely objection is made.[4]

Having decided here that the state court applied its procedural default rule and did so correctly, the federal courts must abide by that decision, cause for failure to object and actual prejudice not having been shown. The district court's dismissal of the petition for habeas corpus relief on the grand jury issue must, therefore, be affirmed. (Emphasis supplied).

Given the sequential organization of the state trial court decision placing the procedural waiver first-in-time as the primary basis of the ruling, the emphasized portion of the foregoing passage from the Court of Appeals opinion seems to indulge a presumption that the state court of appeals was content to dispose of the case on the procedural ground without reaching the issue on its merits. Hence, if that is a correct reading of the Fifth Circuit's opinion in *Ratcliff*, then the broad sweep of the first paragraph of the opinion must be restricted to the particular facts of the case, and when so restricted the decision is not dispositive of this case. Here, as contrasted with the situation in *Ratcliff*, the state court decision was rendered by the Supreme Court of Florida, the state's highest court, which clearly entertained and determined the fair trial issue on the merits as the primary basis of its decision, and the procedural waiver rationale was a secondary and alternative basis of disposition. Under those circumstances, therefore, while the Court of Appeals may ultimately decide that *Ratcliff* applies and that the Petitioner's claim concerning the prosecution's closing argument should be dismissed pursuant to *Wainwright v. Sykes* due to the lack of contemporaneous objection at trial, it behooves this court to consider the claim on its merits.

(c) *The merits of the claim.* At all stages of this proceeding the State has candidly

asserted that "no one has ever even weakly suggested that [the prosecutor's] closing remarks were anything but improper..."[6] And indeed they were. However, the question now to be decided is whether their probable impact upon the jury was such as to deny the Petitioner his constitutional right to due process of law by affording a trial that was fundamentally unfair. Whether an appellate court on direct appeal would ordinarily reverse a conviction under these circumstances in order to deter prosecutorial misbehavior in general and assure a fair or fairer trial is not the issue. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Cobb v. Wainwright*, 609 F.2d 754 (5th Cir. 1980).[7]

The improper portions of the prosecutor's arguments may be grouped into four separate categories: (1) references to the state's Division of Corrections; (2) references to the Petitioner as an "animal"; (3) expression of personal opinion as to the Petitioner's guilt; and (4) other remarks of an inflammatory nature. It is fundamental, however, that any assessment of the effect of improper argument must be made by viewing the argument as a whole and in the context of the entire case. *Cobb v. Wainwright, supra.* In this instance, for example, it is crucial to remember that the defense gained, and exercised, the right to open and close the arguments or summations to the jury—the reverse of the usual sequence of argument so familiar in the federal system. This is important for two reasons. First, as will be seen, much of the prosecutor's diatribe was responsive to the opening argument of the defense; and, secondly, the defense had the "last word" in making rebuttal argument.

In the opening portion of his argument to the jury defense counsel[8] employed a com-

---

6. Respondent's Supplemental Answer quoted at page 9 of the Magistrate's Report and Recommendation.

7. The Magistrate in his Report and Recommendation began his discussion of the issue by recognizing this important distinction (page 14), but some of the decisions he subsequently cited were rendered in direct appeals, and his

analysis employed such terms as "prejudicial error" (page 17) and "prejudicial or reversible error" (page 18).

8. Petitioner was represented by two lawyers throughout the trial. One of them made the opening summation and the other presented the rebuttal argument.

mon defensive technique and spoke at length concerning the *lack* of evidence, i. e., the absence of fingerprints or photographs of the murderer's tire tracks; and, in the jargon of trial lawyers, he generally "put the sheriff on trial." Indeed, at the conclusion of that line of argument counsel said:

The Judge is going to tell you to consider the evidence or the lack of evidence. We have a lack of evidence, *almost criminally negligent on the part of the Polk County Sheriff's Office* in this case. You could go on and on about it. (Emphasis supplied).

Under those circumstances it should come as no surprise that the prosecutor attacked that theme of the defense summation at the very beginning of his argument. He said:

Now [defense counsel] and I am positive and I assure you and I guarantee you that [other defense counsel on rebuttal] will try the Polk County Sheriff's Office; he will try the Polk County Sheriff's Office; and he will try me. And he will try [my co-counsel]. I guarantee that, because he has notes I gave him many years ago.

But let me tell you something. As far as I am concerned, there should be another Defendant in this courtroom, one more, and that is the division of corrections, the prisons. As far as I am concerned, and as [defense counsel] said as he identified this man, this person as an animal, this animal was on the public for

one reason. Because the division of corrections turned him loose, lets him out, lets him out on the public. Can we expect him to stay in a prison when they go there? Can't we expect them to stay locked up once they go there? Do we know that they're going to be out on the public with guns, drinking?

The prosecutor's references to the Division of Corrections were occasioned by the fact, as disclosed by the evidence, that the Petitioner was a convicted felon on weekend furlough from the state prison system at the time of the Turman murder; and the thrust of the prosecutor's opening tirade against the prison authorities was repeated from time to time as his argument progressed.[9] It is apparent in reading the arguments in their entirety, however, that the prosecutor had a dual purpose in mind when he attacked the Division of Corrections. Not only was he shifting the jury's focus away from the sheriff's office—where the defense had sought to fix it—he was also making, in effect, his principal argument in support of the death penalty.[10] This too had been invited by the defense. On two occasions during his opening summation defense counsel made explicit reference to the death penalty. He first remarked: "And they [the prosecutors] are asking you to kill a man on coincidence." There was immediate objection, but it was overruled. Then, at the very end of his argument, defense counsel said:

**9.** "I wish that person or persons responsible for him on the public was in the doorway instead of [the murder victim]. I pray that the person responsible for it would have been in that doorway and any other person responsible for it, I wish that he had been the one shot in the mouth. I wish that he had been the one shot in the neck, instead of [Phillip Arnold]. Yes, there is another Defendant, but I regret that I know of no charges to place upon him, except the public condemnation of them, condemn them.

* * * * * *

Mr. Turman is dead because that unknown defendant we don't have in the courtroom allowed it. He is criminally negligent for allowing it.

* * * * * *

There is one person on trial, not the Polk County Sheriff's Office, not the Hillsborough Sher-

iff's Office, but he and his keepers, the Division of Corrections.

* * * * * *

I cannot help but wish that the Division of Corrections was sitting in the chair with him [the defendant]. Thank you."

**10.** This conclusion is buttressed by the fact that, at the conclusion of the penalty phase of the trial, the prosecutor's argument to the jury is contained on a single page of the transcript. He said only that the prosecution was seeking the death penalty and he exhorted the jury to be attentive to the instructions of the Court. It is also pertinent to note that the first "aggravating circumstance" enumerated in Florida Statute 921.141(5), as explained to the jury by the trial judge, is:

"(a) The capital felony was committed by a person under sentence of imprisonment."

Because, there is so much doubt here, so much unanswered with no attempt to get the answers, that you people have got to walk back in that room and ask yourselves why, why not, why didn't they give us something to work with here instead of coincidence and two people in shock. But they didn't bother to. They didn't bother, the Polk County Sheriff's Office didn't find it necessary.

So they come on up here and ask Citrus County people *to kill the man.* You will be instructed on lesser included offenses. I think that you will find it rather boring. The question is, do they have enough evidence *to kill that man,* enough evidence? And I honestly do not think they do. Thank you for your time. (Emphasis supplied).

The second category of objectionable remarks made by the prosecutor involves two references to the Petitioner as an "animal." The first of those references was made near the beginning of the prosecutor's argument and is contained in the quotation on page 10, *supra.* The second use of the term "animal" by the prosecutor occurred in the following passage:

Some of the remarks I heard in the opening argument by [defense counsel] that I want to remember I disagree with, with his interpretation of the law. You take the law from the Judge. He said that we are asking you to kill this man on this evidence.

Well, he is wrong, of course. I think he knows he is wrong. The Court will tell you at the end of the argument in the Jury instructions at this point, you are merely to determine his innocence or guilt, nothing else, whether he is guilty or innocent. And after you return that verdict of guilty of first degree murder, robbery, and assault with intent to commit murder, the Court will impose a sentence on Count No. 2 and 3, which is robbery and assault with intent to murder, and

then you will be asked at that time to go back and retire and advise the Court whether or not he gets the death sentence or whether he should get life.

That is an advisory opinion on your part, and it has nothing to do with this trial, and [defense counsel] knows that. But I am sure that I want you to remember [defense counsel's] opening statement, opening argument when he called this person an animal. Remember that, because I will guarantee you I will ask for the death. There is no question about it.

As is manifest from that excerpt, defense counsel had first used the term "animal," and he did so not once but twice during his argument, first near the beginning and, second, near the end of his oration: [11]

I intend to just briefly summarize the evidence that has been before you. I'm going to attempt to be as objective as possible. The first witness that you saw was Mrs. Turman, who was a pathetic figure; who worked and struggled all of her life to build what little she had, the little furniture store; and a woman who was robbed, sexually assaulted, and then had her husband slaughtered before her eyes, *by what would have to be a vicious animal.* (Emphasis supplied).

\* \* \* \* \* \*

And this murderer ran after him, aimed again, and this poor kid with half his brains blown away. Fires away, again hits him in the back, and he keeps on running. Mrs. Hill said he ran 500 yards before he collapsed in front of her house. *It's the work of an animal,* there's no doubt about it.

But what about Phillip's identification? Under those circumstances, do you think it is really gotten [sic] good identification? No, it was dark. The man—Phillip Arnold, 16 years old. (Emphasis supplied).

---

11. Defense counsel obviously employed. the term "animal" in order to disavow any contention by the defense that the crimes committed were anything other than a vicious series of events, and to demonstrate empathy with Mrs.

Turman thereby enabling counsel, and the jury, to focus dispassionate attention upon the issue concerning the Petitioner's identity as the alleged perpetrator of the crime.

A third challenge of the prosecutor's jury argument relates to his blatant expression of a personal opinion concerning the guilt of the accused:

> I am convinced, as convinced as I know I am standing before you today, that Willie Jasper Darden is a murderer, that he murdered Mr. Turman, that he robbed Mrs. Turman and that he shot to kill Phillip Arnold. I will be convinced of that the rest of my life.

Anyone attempting a text-book illustration of a violation of the Code of Professional Responsibility, Canon 7, EC 7–24 and DR 7–106(C)(4), could not possibly improve upon that example. Here again, however, the expression of opinion by the prosecutor merely returned a blow already struck not once but twice by defense counsel during his argument. He had said:

> [The Petitioner] was at a preliminary hearing. There were no other black men in the room. Just a question of a woman [Mrs. Turman] admittedly in shock being brought in for a ridiculous legal formality, with her sister to keep her from breaking down to get her there, bring her in, put her on the stand, and say, is this the man? Is she going to say no? *I don't think she would.* The only black man she knew and so from that preliminary hearing we get to this trial and on that identification, which *I think could easily have been mistaken*, because of the circumstances surrounding it. And go so far as to say, *in my opinion, the identification was mistaken.* (Emphasis supplied).
>
> \* \* \* \* \* \*
>
> The question is, do they have enough evidence to kill that man, enough evidence? *And I honestly do not think they do.* Thank you for your time. (Emphasis supplied).

Fourth, and finally, the prosecutor made a series of utterly tasteless and repulsive remarks such as these:

> Mr. Turman, not knowing anything happened, not knowing what was going on. I wish he had had a shotgun in his hand when he walked in the back door and blown his face off. I wish that I could see him sitting here with no face, blown away by a shotgun, but he didn't. He had no gun. He had no chance.
>
> \* \* \* \* \* \*
>
> ... remember her testimony that he unzipped his pants, takes it out and tells the poor woman sitting on the floor to take her teeth out. I wish someone had walked in the back door and blown his head off at that point.
>
> \* \* \* \* \* \*
>
> That's the bullet that went in his brain. That's the one that killed Turman, right there. That's the one that clicked in the boy's face. That's the one that shot him in the mouth. That's the one that shot him in the neck. That's the one that shot him in the back. And Mr. Darden saved one. Again, I wish he had used it on himself.
>
> \* \* \* \* \* \*
>
> He didn't go to the hospital, went on to his girl friend's. He testified all this blood dripping down. I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time.
>
> \* \* \* \* \* \*
>
> Don't forget, please, about when [defense counsel] gets into five foot six and five foot eight, 185 pounds, 200 pounds, don't forget what he has done according to those witnesses, to make every attempt to change his appearance from September the 8th, 1973. The hair, the goatee, even the mustache and the weight. The only thing he hasn't done that I know of is cut his throat.

While these pointless remarks were by no means invited by defense counsel in the manner of those previously discussed, it is significant that defense counsel *did* have the opportunity during rebuttal to respond to them and—on balance—to turn them against the prosecution.[12] Counsel argued:

---

12. The vitriolic remarks of a prosecutor can be "prejudicial" to an accused only if they tend to evoke some sympathy or other passion or prejudice on the part of the jury in favor of the

I, of course, ask you to acquit my client. That's no big surprise, but I ask you another thing, and that is, through being harangued and yelled at, and had a man storm around the courtroom and slap the paper to be demonstrative, don't let him embarrass you into a verdict. Reach the verdict on the evidence.

\* \* \* \* \* \*

Let's go back to the cross-examination of Mr. Darden for a minute. You didn't see the yelling and screaming and righteous indignation and get up and blow your face off. You didn't see that then. . . .

Why no righteous indignation at that point? If the man felt that strongly about it, how could he even get up there and examine him? But you saw him stand right over here in this courtroom, and this podium was right over here, and he just coolly and calmly went through it. . . .

Why, when you have the Defendant on the stand and the opportunity to put him through the most serious, grueling cross-examination with the intent of breaking him down, you didn't see righteous indignation. You didn't see the yelling and the screaming and the pushing and the shoving and the hitting with the stick and the whole works. . . .

Well, the possibility is that he was telling the truth and the State didn't have anything to disprove it. If they had something to disprove that statement it would have been on that stand, and you did not hear it.

Before turning to a review of the applicable authorities there are two other points to be made concerning the effect of the prosecutor's argument. First, the trial judge carefully instructed the jury on two different occasions [13] that the arguments of counsel were not evidence; and, second, the improper argument proceeded without objection until a point very near the end of the prosecutor's oration.[14]

As noted earlier, the leading authority concerning the evaluation of allegedly improper argument upon collateral review in habeas corpus proceedings is *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The Court in that decision took care to distinguish such a case from those "in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights. . ." (416 U.S. at 643, 94 S.Ct. at 1871), and also pointed out that "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice'" (416 U.S. at 642, 94 S.Ct. at 1871). More particularly, the Court specifically distinguished *Miller v. Pate* and *Brady v. Maryland*[15] because the prosecutorial misbehavior in both of those cases involved manipulation of the *evidence* as well as abuses during argument or summation; and it concluded its discussion with the following ob-

state or, perhaps, the victim of the crime, and against the defendant. It is difficult if not impossible to see how any of the offensive comments in this instance could do anything but alienate the jury and weaken the state's case. They were certainly not calculated to engender undue sympathy for the victims nor were they keyed to arouse prejudice against the accused on any basis other than the horror of the crimes themselves.

13. R. 185–186; 713–714.

14. Although the objection then made was overruled it is pertinent to note that the prosecutor avoided objectional rhetoric from that point on in his argument. Also, with respect to the Court's overruling the objection, the phrasing selected by defense counsel in stating his objec-

tion was: "I wish the Court would instruct [the prosecutor] to stick with what little evidence he has." The prosecutor responded: "You don't have any evidence yourself. . ." And the Court said: "All right, gentlemen. Proceed with your argument. Objection will be overruled." Obviously, given that exchange, if the judge had sustained the objection as stated it would be tantamount to making a direct comment on the strength or weakness of the state's case. By rebuking counsel and directing that the argument proceed the judge did about all he could do at that particular moment.

15. *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

servations (416 U.S. at 645, 647–648, 94 S.Ct. at 1872, 1873):

> Although the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process.

\* \* \* \* \* \*

The result reached by the Court of Appeals in this case leaves virtually meaningless the distinction between ordinary trial error of a prosecutor and that sort of egregious misconduct held in *Miller* and *Brady, supra,* to amount to a denial of constitutional due process.

Since *Donnelly v. DeChristoforo* was decided in 1974 there have been three decisions in the Courts of Appeals in which it was determined that a writ of habeas corpus should issue in favor of a state prisoner because of improper prosecutorial argument to the jury at trial. *Miller v. North Carolina,* 583 F.2d 701 (4th Cir. 1978); *Houston v. Estelle,* 569 F.2d 372 (5th Cir. 1978); *Kelly v. Stone,* 514 F.2d 18 (9th Cir. 1975). See also, *U. S. ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir. 1973). In each of those cases, however, except *Houston,* the prosecutor made a direct appeal to racial prejudice; and such decisions are clearly distinguishable on that basis.

*Houston,* which also happens to be a Fifth Circuit decision, is the only Court of Appeals opinion granting habeas relief on the basis of prejudicial prosecutorial argument concerning matters other than race. The petitioner in that case had been charged in the Texas courts with the offense of possessing heroin. During summations the prosecutor first chided the defense about making objections and then repeatedly argued—even after the court had sustained objection—that the petitioner was in fact a dealer or pusher of heroin. Thus, with the defense restrained from making objections for fear of appearing to obstruct the proceedings, the prosecutor merely accelerated his attack. Moreover, in addition to the argument which effectively misstated and manipulated the evidence, i. e., that

the defendant was a dealer when the charge was simple possession, the prosecutor also committed all of the sins of the prosecution in this case as well as some not present in this record—vouching for the credibility of prosecution witnesses while branding defense witnesses as liars; characterizing defense counsel as hypocrites; making offensive remarks about the sentencing process; attempting to associate the defendant with spectators and implying threats of violence against the jury. The facts of *Houston* simply stand apart as Judge Goldberg declared in his universally eloquent style (569 F.2d at 382–383).

Two other recent decisions of the Fifth Circuit are much more similar to the facts of this case, and they point the way to a proper disposition. *Cronnon v. Alabama,* 587 F.2d 246 (5th Cir. 1979), cert. denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979), and *Cobb v. Wainwright,* 609 F.2d 754 (5th Cir. 1980). *Cronnon* is particularly apt. In a state court murder trial the prosecutor referred to the defendant as a "fiendish ghoul;" he spoke of the assailant's desire to hear the "squish" of the victim's blood; he suggested that, unless convicted, the defendant would kill again; he called the defendant a liar and asserted that he, the prosecutor, would also lie if he was accused under similar circumstances; he exhorted the jury to place themselves in the shoes of the murdered teenager's parents; and, as in this case, the entire diatribe was delivered without objection. The Court (Judge Rubin concurring by separate opinion) denied the writ. The opinion in *Cobb* does not disclose in detail the nature of the prosecutor's challenged argument (other than apparent references to the Bible); but it is particularly instructive with respect to the view of the Circuit concerning the application of *Donnelly v. DeChristoforo.* The Court said (609 F.2d at 755–756):

> There is no question that the prosecutor in this case made an inflammatory argument. If the trial had been held in federal district court a number of his comments would have constituted more

than adequate grounds for a mistrial. In a 28 U.S.C. § 2254 proceeding, however, the scope of review is a narrow one. The Supreme Court only recently ruled in *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), a case also involving charges of prejudicial prosecutorial comment, that not every trial error or infirmity which might on direct appeal call for application of supervisory powers correspondingly constitutes the denial of due process necessary to support a grant of relief under 28 U.S.C. § 2254.... Unless a specific guarantee of the Bill of Rights is involved, it must be shown that the remarks were so prejudicial that they rendered the trial in question fundamentally unfair. 416 U.S. at 643, 94 S.Ct. 1868. Here the claim is simply that the prosecutor's remarks so infected the trial with unfairness as to make the conviction a denial of due process.

Given the circumstances of this case, we conclude, and our conclusion is made easier by the strength of the evidence against Cobb, that no prejudice amounting to such a denial of constitutional due process was shown. Unlike *Houston v. Estelle*, 569 F.2d 372, 376–84 (5th Cir. 1978), a Section 2254 proceeding in which we did reverse a conviction for prosecutorial misconduct, this is not a case in which the prosecutor attempted to mislead the jury with allusions to nonexistent evidence. See also *United States v. Herberman*, 583 F.2d 222, 229–30 (5th Cir. 1978). Nor is this a case, as was *Houston*, in which the prosecutor had the last word. Here the prosecutor's argument was followed by two final defense arguments, one of which was made by Cobb's attorney on Cobb's behalf.

■ In this instance the Supreme Court of Florida thoroughly reviewed the issue and concluded that "although the prosecutor's remarks under ordinary circumstances

would constitute a violation of the Code of Professional Responsibility, in this particular case they amount to harmless error when the totality of the record is considered in these uniquely vicious crimes." *Darden v. State*, 329 So.2d 287, 290 (Fla.1976). The Supreme Court of the United States has recently reminded us that this determination is entitled to great deference pursuant to 28 U.S.C. § 2254(d), at least to the extent it involves a factual determination. *Sumner v. Mata*, —— U.S. ——, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Moreover, upon an equally thorough review of the record (in search of constitutional infringement, not "reversible error"), I am also convinced that no relief is warranted. The prosecutor's argument did not involve a manipulation or misstatement of the evidence nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent; most of the objectional content was invited by or was responsive to the opening summation of the defense; the Court instructed the jury on two occasions that the argument of counsel was not evidence and that their decision was to be made on the basis of the evidence alone; the challenged argument was presented without objection; [16] the defense had the "last word" through the presentation of rebuttal argument; and the weight of the evidence against the Petitioner was heavy; indeed, the Supreme Court of Florida said there "was overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges..." (329 So.2d at 291). Darden's trial was not perfect—few are—but neither was it fundamentally unfair.

### III Witherspoon vs. Illinois

■ (a) *Is the issue presented* ? The state vociferously argues that the Magistrate "fabricated" the *Witherspoon* issue which was never presented by the Petitioner or, if presented, was abandoned because

---

**16.** Lead defense counsel testified during the evidentiary hearing before the Magistrate that he deliberately withheld objection because he thought the argument might place error in the record which an objection would only serve to

cure (T. 333–334). He also said (T. 365–366) that in his view the prosecutor's argument did not address the issues and "was almost an indictment of the jury." See footnote, *supra*, page 15.

it was not argued in the briefs. This contention is utterly without merit. During the course of the proceedings before the Magistrate the Respondent was granted leave to propound written interrogatories to the Petitioner. Interrogatory No. 3 requested an enumeration of all of Petitioner's claims which might present grounds for relief under 28 U.S.C. § 2254. On September 7, 1979, the Petitioner filed a supplemental answer to that interrogatory which stated, in paragraphs 19 and 20, contentions which can only be read as asserting a claim under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); and, on September 14, 1979, the parties jointly filed an amendment to their earlier pre-trial stipulation in which they incorporated all of the claims asserted in the supplemental answer to the interrogatory, and further provided that those claims should be decided on a review of the record with no additional evidence to be presented at the hearing. The Magistrate properly considered those claims. It would have been error not to do so.

■ *(b) The merits of the claim.* It is unnecessary to engage in any detailed analysis of *Witherspoon* or the line of Supreme Court decisions flowing after it because Judge Gee, speaking for the Fifth Circuit in *Burns v. Estelle,* 592 F.2d 1297, 1300 (5th Cir. 1979), *approved en banc,* 626 F.2d 396 (1980), fully reviewed and then summarized the development of the law:

And so our survey of ruling Supreme Court law in the area is complete. It may be summarized:

1. Only the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds. A mere disbelief in it, or even 'conscientious or religious scruples against its infliction' will not suffice, since many people hold such views and some of these may yet be able to overcome them and abide by the law.

2. No jury from which even one person has been excused on broader *Wither-* spoon-type grounds than these may impose a death penalty or sit in a case where it may be imposed, regardless of whether an available peremptory challenge might have reached him.

■ In this instance, during the voir dire examination of the jury panel, a total of five prospective jurors were excused for cause due to their expressed opposition to capital punishment. The Magistrate concluded, as to two of the five, that a *Witherspoon* violation occurred. To evaluate that conclusion it will be necessary to review and quote from the trial record at some length.

It should first be observed that the trial judge was fully conscious of the existence of the *Witherspoon* decision. That is clear because the record discloses a specific pretrial discussion of the case. Defense counsel made a motion to exclude any examination of prospective jurors concerning their attitudes about the death penalty because of the bifurcation of that issue, citing *Witherspoon* ; but the trial judge ruled, quite properly, that the motion would be denied since, in the event of conviction, the same jury would then consider the issue of punishment. The Court also remarked (R. 18):

It is my ruling if a prospective juror states on his voir dire examination that because of his moral, religious or conscientious principles and belief he would be *unwilling to recommend a death penalty, even though the facts and circumstances meet the requirements of law,* then he in effect has said he would be unwilling to follow the law the court shall charge upon it and disregard and be unwilling to follow it or if he did follow it, it would be going against his principles, and, therefore, I would rule that would be disqualification. If that exists, I intend to disqualify for cause. (Emphasis supplied).

The court then called the case for trial and began the voir dire examination of the jury panel. During the course of that examination five prospective jurors were excused for cause due to the responses they gave to the judge's *Witherspoon* questions. It is necessary to quote in their proper sequence seven segments of the voir dire

examination during which *Witherspoon* questions were propounded and the subject jurors were excused.[17] The first segment includes the court's general explanation to the panel as a whole concerning the purpose and intent of the *Witherspoon* examination followed immediately by the specific questioning which resulted in the excusal of prospective jurors Varney and Mays. The remaining sequential quotations reveal the court's questioning of other jurors down through the examination and excusal of juror Murphy, the last to be excused for cause.

[The court] At this time I want to get off into a different area concerning the capital punishment feature of the case. I have explained to you already the basic procedure. How we have a two section trial and how although the final determination in the event of a verdict of guilty of first degree murder the final determination as to penalty will be mine. But that you, if you are selected on the jury, would be called upon to listen to further testimony and to advise me by advisory sentence.

Now at the time of the submission of the case, should that time ever arrive, you will be instructed by me on the law as to what matters you should consider and what you should not consider and how you should go about in arriving at your advisory sentence. Under certain circumstances if you find the aggravating circumstances are sufficient they are not outweighed by mitigating then it would be proper under the law your correct verdict would be to recommend the death penalty.

Now I am going to ask each of you individually the same question so listen to me carefully, I want to know if any of you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be *unwilling* to vote to return an advisory sentence recommending the death sentence *even though the facts presented to you should be such as under the law would require that recommendation*? Do you understand my question?...

17. R. 42–46; 49; 88; 106–107; 109–110; 151; 165. All emphasis supplied.

All right, Mrs. Macy, do you hold such conscientious moral or religious principles in opposition to the death penalty you would be unwilling *under any circumstances* to recommend the death sentence?

MRS. MACY: No, sir.

THE COURT: Do you, Mr. Blankenship?

MR. BLANKENSHIP: No, sir.

THE COURT: Mr. Pelellat?

MR. PELELLAT: No, sir.

THE COURT: Mrs. Spike.

MRS. SPIKE: No, sir.

MR. VARNEY: Yes, sir.

THE COURT: You feel then, sir, that even though and I am not saying it will it would be purely speculative, in the event that the evidence should be such that under the law that should be the legal recommendation you would be *unwilling* to return such a recommendation because of your conscientious beliefs?

MR. VARNEY: I believe I would.

THE COURT: All right, sir. You will be excused.

MR. MALONEY: I renew the objection. I do not think he should be challenged for cause.

THE COURT: Yes, sir, the objection will be noted and overruled.

All right, Mr. Varney, you will be excused. Thank you very much for your service.

CLERK: Debora Ratley.

(Ms. Ratley was seated in the jury box.)

CLERK: Number 114.

THE COURT: Mrs. Hann, do you hold such strong conscientious moral or religious beliefs that you would be *unwilling under any event* to return a death sentence?

MRS. HANN: No, sir.

THE COURT: Mr. Waller?

MR. WALLER: No, sir.

THE COURT: Mr. DeMilt?

MR. DeMILT: No, sir.

THE COURT: Mr. Dorminy?

MR. DORMINY: No, sir.

THE COURT: Mrs. Keck?

MRS. KECK: No, sir.

THE COURT: Mr. Roberts?

MR. ROBERTS: No, sir.

THE COURT: Mr. Mays?

MR. MAYS: Yes. I could not recommend it.

THE COURT: All right.

You will be excused, Mr. Mays. Mr. Maloney, I assume you wish the same objection to apply to him.

MR. MALONEY: Yes, Your Honor.

THE COURT: So recorded.

\* \* \* \* \* \*

THE COURT: Do either of you know of any reason why you couldn't sit as a fair and impartial jurors in this case?

MR. PURCELL: No.

MRS. O'BRY: No.

THE COURT: Do either of you hold such strong moral or religious conscientious principles in opposition to the imposition of the death penalty that you would be *unwilling* to recommend the imposition of the death penalty *regardless of the evidence*?

MR. PURCELL: No.

MRS. O'BRY: No.

THE COURT: All right, Mr. McDaniel, if you are going to conduct the examination for the State you may inquire.

\* \* \* \* \* \*

THE COURT: And will you require the State to prove his guilt beyond every reasonable doubt as I have defined reasonable doubt to you?

MR. CARHUFF: Yes, sir.

MR. SCHNEIDER: Yes, sir.

MRS. LUCKER: Yes, sir.

THE COURT: Do either of the three of you hold such strong religious, moral or conscientious principles in opposition to the imposition of the death penalty that you would be *unwilling* to vote to recommend the death penalty *regardless of what the evidence was*?

MR. CARHUFF: No, sir.

MR. SCHNEIDER: No, sir.

MRS. LUCKER: No, sir.

\* \* \* \* \* \*

[The court] Ms. Carn, the fact your husband for a while was a police officer and the fact that we have here listed as witnesses many police officers and deputy sheriffs conceivably could raise a little bit of a problem. Do you think that because of your husband's previous occupation that you might be a little inclined to give what the officers say more weight than you would any other witness you didn't know?

MS. CARN: I don't think that would; but I do not believe in capital punishment.

THE COURT: The question isn't, ma'am, whether you believe in capital punishment or not; the question is whether or not you have such a strong disbelief in it as to make it *unable* for you to vote to return a recommendation of the death penalty *regardless of what the evidence might be.*

MS. CARN: That's right.

THE COURT: All right, ma'am. Then we will excuse you then right now. I appreciate your candor.

\* \* \* \* \* \*

[The court] I have asked the others and I will ask each of the four of you whether you have such strong religious, conscientious or moral principles against the imposition of the death penalty that you would be *unwilling* to vote to return a recommended sentence of the death penalty *regardless of what the evidence or the facts might be*?

Would you Ms. Pigeon?

MS. PIGEON: Yes, sir.

THE COURT: Mr. Wall?

MR. WALL: No, sir.

THE COURT: How about you, Ms. Maher?

MS. MAHER: Yes, I do have such convictions. I am a Seventh Day Adventist.

THE COURT: *And no matter what the evidence showed* you don't think you would vote for it?

MS. MAHER: I couldn't, sir.

THE COURT: Very well, over the objections of the defendant she will be excused.

(Ms. Maher was excused from the jury box.)

\* \* \* \* \* \*

THE COURT: Do you have any religious, moral or conscientious principles against the death penalty that are so strong that you would be unwilling to vote to recommend the death penalty regardless of what the facts might be?

\* \* \* \* \* \*

CLERK: Theodore T. Murphy. Number 87.

(Mr. Murphy was seated in the jury box.)

THE COURT: Mr. Murphy, what is your occupation?

MR. MURPHY: Retired.

THE COURT: What did you do prior to retirement, sir?

MR. MURPHY: Several jobs. I was eight and a half years in the administration office in a seminary, before that I was thirty years with the utilities.

THE COURT: What seminary were you with, sir?

MR. MURPHY: St. Pios, Uniondale, New York.

THE COURT: Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be *unable* without violating your own principles to vote to recommend a death penalty *regardless of the facts*?

MR. MURPHY: Yes, I have.

THE COURT: All right, sir, you will be excused then.

(Mr. Murphy left the jury box.)

The Magistrate characterized the examination of juror Varney (at the beginning) and juror Murphy (at the end) as too "cursory" and "abbreviated," and concluded that, as to them, "the hard question was not asked." (Magistrate's Report and Recommendation, page 30). Apart from the relative length of the examination—which has no legal significance—I am at a loss to understand the Magistrate's conclusion that the "hard" question was not asked. Clearly, the hard question *was* asked, repeatedly and without deviation from the minimal requirements of *Witherspoon*. In each instance the jurors were interrogated as to whether they would be "unwilling" or "unable" to recommend a death sentence "regardless of the facts" or "regardless of the evidence." The jurors who were excused gave affirmative responses to those "hard" questions and they were properly dismissed.[18]

This is not a case like *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), or *Burns v. Estelle, supra*, in which prospective jurors were merely asked whether the specter of the death penalty might "affect" them in their deliberations; nor is it a case like *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), or *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970), in which some prospective jurors were asked only if they had any "fixed opinions" or "feelings," or whether they harbored any scruples about capital punishment which "might" prevent such a verdict. Rather, the voir dire examination in this case is indistinguishable from the approved examination of the regular members of the jury in *Smith v. Whisman*, 431 F.2d 1051, 1058 (5th Cir. 1970), in which jurors were asked whether their opposition to capital punishment would prevent them from returning a death verdict "under any circumstances." See also *Boulden v. Holman, supra*, in which

---

18. In addition to finding the questions of the court to be insufficient in form, the Magistrate also found the response of juror Varney to be ambiguous when he ultimately answered "I believe I would." It must be noted, however, that Mr. Varney first gave an unqualified yes in answer to the question whether he would be

"unwilling under any circumstances to recommend the death sentence." Because of his affirmative response the Court pressed the subject with another question and he declared, again, "I believe I would." Nothing more was required. A juror should be subjected to voir dire examination, not cross examination.

the Court approved the excusal of those jurors who simply stated that they would "never" impose a death sentence.

There was no *Witherspoon* violation in this case.

## IV Conclusion

The Petitioner's trial was not perfect, but neither was it fundamentally unfair. His jury was properly examined on voir dire and none was excused merely because of expressed opposition to capital punishment. His other claims of constitutional deprivation were determined by the Magistrate to be unfounded, and in that the Magistrate was correct.

The petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED, and the stay of the warrant is DISSOLVED. The Clerk is directed to enter final judgment.

## V Epilogue

The Turman murder occurred in 1973. Darden was quickly apprehended, and was promptly tried, convicted and sentenced within a year. His direct appeal was decided by the Supreme Court of Florida in 1976, and the following year the Supreme Court of the United States discharged a writ of certiorari previously granted. Clemency proceedings occupied the next two years, and the Governor ultimately signed a death warrant in May, 1979. Petitioner then filed the instant petition in this Court, pursuant to 28 U.S.C. § 2254, almost six years after the offense.

The nature of the case, and others like it, has attracted intensive publicity which has, in turn, served to fuel a growing public frustration concerning the administration of criminal justice in the courts. The Chief Justice of the United States in his last annual address to the American Bar Association recognized and gave voice to the same public frustration; and, to the extent that this very real exasperation is fomenting an overall loss of confidence on the part of the public in its court system, particularly the federal courts, those who supply the public with information and opinion should be particularly careful to impart only that information which is accurate in every detail. Unfortunately, many lay persons and even some lawyers and judges do not seem to understand the historical or the contemporary role of the federal courts in habeas corpus proceedings involving state prisoners, and that lack of understanding has caused the public to be the recipient of a considerable quantity of misinformation and erroneous innuendo concerning the proper institution of government upon which responsibility should be placed for both the condition and the cure.

The Constitution of the United States, Article I, Section 9, Clause 2, the so-called non-suspension clause, provides as follows:

> "The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

Many seem to believe that this constitutional provision is the direct jurisdictional base of habeas corpus proceedings involving state prisoners. That conclusion is open to substantial doubt. Until 1867, or during the first seventy-eight years of constitutional government, the writ of habeas corpus in the federal courts was governed by the Judiciary Act of 1789 and extended only to prisoners held in custody by the United States, not the several states. Furthermore, even with respect to federal prisoners, the scope or power of the writ was limited to an inquiry as to the jurisdiction of the sentencing tribunal.

In 1867 the availability of the writ of habeas corpus in the federal courts was extended to state prisoners by act of congress now embodied in 28 U.S.C. § 2254. Even then, however, the early cases limited the reach of the writ to an examination of the jurisdiction of the sentencing court. See *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). See also *Schneckloth v. Bustamonte*, 412 U.S. 218, 250, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973) (Powell, J., concurring), and *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Recently, in *Swain v. Pressley*, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977),

dealing with the statute creating the Superior Court of the District of Columbia, the Court's decision suggests that the District Courts might well be relieved, with constitutional impunity, of any jurisdiction to issue writs of habeas corpus at the behest of state prisoners so long as state law affords an adequate and effective collateral remedy to test the legality of the petitioner's detention.

 In any event, whether the constitution has etched the writ in stone to any degree or not at all is not the point here. It is enough that the existing *statutes*, 28 U.S.C. §§ 2241 and 2254, afford the remedy and thus *require* the District Courts to entertain a state prisoner's application for a writ of habeas corpus if it is claimed that he is detained in custody in violation of the Constitution or laws or treaties of the United States. Moreover, the fact that the state courts have heard and adjudicated the constitutional claim does not generally [19] preclude the authority and duty of the District Court to make an independent determination of the constitutional issue. Indeed, as a matter of comity to the state courts, the statute requires that all existing state remedies be exhausted *before* the petition is filed in the federal court so that, of necessity, the habeas proceeding is always a re-hashing of the constitutional issues already decided in the state courts.

The point of this discussion is that, while there is great clamor for statutory redress of our present law concerning habeas corpus relief, all involved should remember (or should be clearly informed, as the case might be) that the existing law is itself of *statutory* origin. It was not created, and cannot be amended, by the courts. Given the statute it would be a gross violation of law and of a judge's oath of office if he should arbitrarily decline to entertain a proper petition filed under it; and to the extent there is widespread belief that the federal courts have somehow "bootstrapped" their own authority to indiscriminately meddle in state court criminal prosecutions—a belief nurtured by inferences to that effect in the public press—unjustified and unnecessary damage is being done to the very system of judicial administration in which all of us are so vitally interested. Those who wish to debate the need for change should focus their attention and the brunt of their remarks upon the statute and the Congress, not the Courts.

In addition to substantive issues, there is also public concern about the length of time taken by the courts in disposing of habeas corpus proceedings. Quite apart from the notoriously crowded dockets of the federal courts, however, a circumstance which is also beyond the control of the courts, there is no provision in 28 U.S.C. § 2254 requiring expedited consideration whereas there are at least two dozen other statutes which do require that preference be given to specified classes of cases such as, for example, criminal cases governed by the Speedy Trial Act, 18 U.S.C. § 3161.[20]

Whatever the future may hold for habeas corpus proceedings instituted by state prisoners generally, and whatever the public perspective may be, the case of Willie Jasper Darden has been thoroughly, thoughtfully and quietly considered under the statute and the Constitution, and judgment will now be entered as directed. The Petitioner may then seek timely review by the Court of Appeals, as is his right.

**19.** *Stone v. Powell, supra*, dealing with Fourth Amendment issues, constitutes an exception.

**20.** A habeas corpus proceeding under 28 U.S.C. § 2254 is a civil case in the federal court. Examples of other statutes requiring expedited consideration of certain civil cases are 42 U.S.C. § 2000e–5(f)(5), Equal Employment Opportunity Act; 42 U.S.C. § 1971(g), Voting Rights Act; 29 U.S.C. § 1303(e)(4), Employee Retirement Income Security Act; 42 U.S.C. § 504(e), Social Security Act.