# DARDEN *v.* WAINWRIGHT, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS

No. 85–5319.   Argued January 13, 1986—Decided June 23, 1986

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p, 187. BRENNAN, J., filed a dissenting opinion, *post*, p. 188. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 188.

*Robert Augustus Harper, Jr.*, argued the cause and filed briefs for petitioner.

*Richard W. Prospect*, Assistant Attorney General of Florida, argued the cause for respondent. With him on the brief was *Jim Smith*, Attorney General.

JUSTICE POWELL delivered the opinion of the Court.

This case presents three questions concerning the validity of petitioner's criminal conviction and death sentence: (i) whether the exclusion for cause of a member of the venire violated the principles announced in *Wainwright v. Witt*, 469 U. S. 412 (1985); (ii) whether the prosecution's closing argument during the guilt phase of a bifurcated trial rendered the trial fundamentally unfair and deprived the sentencing determination of the reliability required by the Eighth Amendment; and (iii) whether petitioner was denied effective assistance of counsel at the sentencing phase of his trial.

I

Petitioner was tried and found guilty of murder, robbery, and assault with intent to kill in the Circuit Court for Citrus County, Florida, in January 1974. Pursuant to Florida's capital sentencing statute, the same jury that convicted petitioner heard further testimony and argument in order to make a nonbinding recommendation as to whether a death sentence should be imposed. The jury recommended a death sentence, and the trial judge followed that recommendation. On direct appeal, the Florida Supreme Court affirmed the conviction and the sentence. Petitioner made several of the same arguments in that appeal that he makes here. With respect to the prosecutorial misconduct claim, the court disapproved of the closing argument, but reasoned that the law required a new trial "only in those cases in which it is reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt . . . or in which the comment is unfair." *Darden v. State*, 329 So. 2d 287, 289 (1976). It concluded that the comments had not rendered

petitioner's trial unfair. Petitioner's challenge to the juror exclusion was rejected without comment. Petitioner did not at that time raise his claim of ineffective assistance of counsel. This Court granted certiorari, 429 U. S. 917 (1976), limited the grant to the claim of prosecutorial misconduct, 429 U. S. 1036 (1977), heard oral argument, and dismissed the writ as improvidently granted, 430 U. S. 704 (1977).

Petitioner then sought federal habeas corpus relief, raising the same claims he raises here. The District Court denied the petition. *Darden* v. *Wainwright*, 513 F. Supp. 947 (MD Fla. 1981). A divided panel of the Court of Appeals for the Eleventh Circuit affirmed. *Darden* v. *Wainwright*, 699 F. 2d 1031 (1983). The Court of Appeals granted rehearing en banc, and affirmed the District Court by an equally divided court. 708 F. 2d 646 (1983). Following a second rehearing en banc the Court of Appeals reversed on the claim of improper excusal of a member of the venire. 725 F. 2d 1526 (1984). This Court granted the State's petition for certiorari on that claim, vacated the Court of Appeals' judgment, and remanded for reconsideration in light of *Wainwright* v. *Witt*. 469 U. S. 1202 (1985). On remand, the en banc court denied relief, 767 F. 2d 752 (1985). Petitioner filed an application for a stay of his execution that this Court treated as a petition for certiorari and granted, at the same time staying his execution. 473 U. S. 928 (1985). We now affirm.

II

Because of the nature of petitioner's claims, the facts of this case will be stated in more detail than is normally necessary in this Court. On September 8, 1973, at about 5:30 p.m., a black adult male entered Carl's Furniture Store near Lakeland, Florida. The only other person in the store was the proprietor, Mrs. Turman, who lived with her husband in a house behind the store. Mr. Turman, who worked nights at a juvenile home, had awakened at about 5 p.m., had a cup of coffee at the store with his wife, and returned home to let

172

their dogs out for a run.   Mrs. Turman showed the man around the store.   He stated that he was interested in purchasing about $600 worth of furniture for a rental unit, and asked to see several different items.   He left the store briefly, stating that his wife would be back to look at some of the items.

The same man returned just a few minutes later asking to see some stoves, and inquiring about the price.   When Mrs. Turman turned toward the adding machine, he grabbed her and pressed a gun to her back, saying "Do as I say and you won't get hurt."   He took her to the rear of the store and told her to open the cash register.   He took the money, then ordered her to the part of the store where some box springs and mattresses were stacked against the wall.   At that time Mr. Turman appeared at the back door.   Mrs. Turman screamed while the man reached across her right shoulder and shot Mr. Turman between the eyes.   Mr. Turman fell backwards, with one foot partially in the building.   Ordering Mrs. Turman not to move, the man tried to pull Mr. Turman into the building and close the door, but could not do so because one of Mr. Turman's feet was caught in the door.   The man left Mr. Turman faceup in the rain, and told Mrs. Turman to get down on the floor approximately five feet from where her husband lay dying.   While she begged to go to her husband, he told her to remove her false teeth.   He unzipped his pants, unbuckled his belt, and demanded that Mrs. Turman perform oral sex on him.   She began to cry "Lord, have mercy."   He told her to get up and go towards the front of the store.

Meanwhile, a neighbor family, the Arnolds, became aware that something had happened to Mr. Turman.   The mother sent her 16-year-old son Phillip, a part-time employee at the furniture store, to help.   When Phillip reached the back door he saw Mr. Turman lying partially in the building.   When Phillip opened the door to take Turman's body inside, Mrs. Turman shouted "Phillip, no, go back."   Phillip did not know

what she meant and asked the man to help get Turman in-
side.  He replied, "Sure, buddy, I will help you."  As Phillip
looked up, the man was pointing a gun in his face.  He pulled
the trigger and the gun misfired; he pulled the trigger again
and shot Phillip in the mouth.  Phillip started to run away,
and was shot in the neck.  While he was still running, he was
shot a third time in the side.  Despite these wounds, Phillip
managed to stumble to the home of a neighbor, Mrs. Edith
Hill.  She had her husband call an ambulance while she tried
to stop Phillip's bleeding.  While she was helping Phillip, she
saw a late model green Chevrolet leave the store and head
towards Tampa on State Highway 92.  Phillip survived the
incident; Mr. Turman, who never regained consciousness,
died later that night.

Minutes after the murder petitioner was driving towards
Tampa on Highway 92, just a few miles away from the furni-
ture store.  He was out on furlough from a Florida prison,
and was driving a car borrowed from his girl friend in Tampa.
He was driving fast on a wet road.  Petitioner testified that
as he came up on a line of cars in his lane, he was unable to
slow down.  He attempted to pass, but was forced off the
road to avoid a head-on collision with an oncoming car.  Peti-
tioner crashed into a telephone pole.  The driver of the on-
coming car, John Stone, stopped his car and went to peti-
tioner to see if he could help.  Stone testified that as he
approached the car, petitioner was zipping up his pants and
buckling his belt.  Police at the crash site later identified pe-
titioner's car as a 1969 Chevrolet Impala of greenish golden
brown color.  Petitioner paid a bystander to give him a ride
to Tampa.  Petitioner later returned with a wrecker, only to
find that the car had been towed away by the police.

By the time the police arrived at the scene of the accident,
petitioner had left.  The fact that the car matched the de-
scription of the car leaving the scene of the murder, and that
the accident had occurred within three and one-half miles of
the furniture store and within minutes of the murder, led po-

lice to suspect that the car was driven by the murderer. They searched the area. An officer found a pistol—a revolver—about 40 feet from the crash site. The arrangement of shells within the chambers exactly matched the pattern that should have been found in the murder weapon: one shot, one misfire, followed by three shots, with a live shell remaining in the next chamber to be fired. A specialist for the Federal Bureau of Investigation examined the pistol and testified that it was a Smith & Wesson .38 special revolver. It had been manufactured as a standard .38; it later was sent to England to be rebored, making it a much rarer type of gun than the standard .38. An examination of the bullet that killed Mr. Turman revealed that it came from a .38 Smith & Wesson special.

On the day following the murder petitioner was arrested at his girl friend's house in Tampa. A few days later Mrs. Turman identified him at a preliminary hearing as her husband's murderer. Phillip Arnold selected petitioner's picture out of a spread of six photographs as the man who had shot him.[1] By that time, a Public Defender had been appointed to represent petitioner.

---

[1] There are some minor discrepancies in the eyewitness identification. Mrs. Turman first described her assailant immediately after the murder while her husband was being taken to the emergency room. She told the investigating officer that the attacker was a heavy-set man. Tr. 237. When asked if he was "neat in his appearance, clean-looking, clean-shaven," she responded "[a]s far as I can remember, yes, sir." Ibid. She also stated to the officer that she thought that the attacker was about her height, 5′ 6″ tall, and that he was wearing a pullover shirt with a stripe around the neck. Id., at 227. The first time she saw petitioner after the attack was when she identified him at the preliminary hearing. She had not read any newspaper accounts of the crime, nor had she seen any picture of petitioner. When she was asked if petitioner was the man who had committed the crimes, she said yes. She also repeatedly identified him at trial.

Phillip Arnold first identified petitioner in a photo lineup while in the hospital. He could not speak at the time, and in response to the written question whether petitioner had a mustache, Phillip wrote back "I don't

As petitioner's arguments all relate to incidents in the course of his trial, they will be taken up, together with the relevant facts, in chronological order.

## III

Petitioner contends that one member of the venire, Mr. Murphy, was excluded improperly under the test enunciated in *Wainwright* v. *Witt*, 496 U. S. 412 (1985). That case modified this Court's opinion in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968). *Witherspoon* had held that potential jurors may be excused for cause when their opposition to the death penalty is such that they automatically would vote against a sentence of death or would be impaired in the task of determining defendant's guilt. *Witt* held that the proper test is whether the juror's views on capital punishment would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U. S., at 424, quoting *Adams* v. *Texas*, 448 U. S. 38, 45 (1980). *Witt* also made clear that the trial judge's determination that a potential juror is impermissibly biased is a factual finding entitled to a presumption of correctness under 28 U. S. C. § 2254.

Petitioner's argument on this issue relies solely on the wording of a question the trial court asked Murphy before excluding him. The court asked: "Do you have any moral or religious, conscientious moral or religious principles in oppo-

---

think so." *Id.*, at 476. Phillip also testified at trial that the attacker was a heavy-set man wearing a dull, light color knit shirt with a ring around the neck. *Id.*, at 443. He testified that the man was almost his height, about 6′ 2″ tall.

A motorist who stopped at the scene of the accident testified that petitioner was wearing a white or off-grey button-down shirt and that he had a slight mustache. *Id.*, at 313, 318–320. In fact, the witness stated that he "didn't know it was that [the mustache] or the raindrops on him or not. I couldn't really tell that much to it, it was real thin, that's all." *Id.*, at 318–319. Petitioner is about 5′ 10″ tall, and at the time of trial testified that he weighed about 175 pounds.

sition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?" App. 9. Petitioner argues that this question does not correctly state the relevant legal standard. As *Witt* makes clear, however, our inquiry does not end with a mechanical recitation of a single question and answer. 469 U. S., at 424–426. We therefore examine the context surrounding Murphy's exclusion to determine whether the trial court's decision that Murphy's beliefs would "substantially impair the performance of his duties as a juror" was fairly supported by the record.

During *voir dire*, but prior to individual questioning on this point, the trial court spoke to the entire venire, including Murphy, saying:

> "Now I am going to ask each of you individually the same question so listen to me carefully, I want to know if any of you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence recommending the death sentence even though the facts presented to you should be such as under the law would require that recommendation? Do you understand my question?"

The court then proceeded to question the members of the venire individually, but did so while the entire venire was present in the courtroom. Thus, throughout the individual questioning, all the veniremen could hear the questions and answers. In fact, the prosecution frequently incorporated prior questioning of other veniremen by reference, each time with the assurance from the individual being questioned that he or she had heard and understood the previous questions. See Tr. 89–90, 112, 141–142; see also *id.*, at 150.

The court repeatedly stated the correct standard when questioning individual members of the venire.[2]  Murphy was present and heard the court ask the proper *Witherspoon* question over and over again.[3]  After many instances of such

[2] Prior to *voir dire* defense counsel objected to any questioning by the prosecution regarding a potential juror's feelings about the death penalty. The judge denied the motion, stating:

"It is my ruling if a prospective juror states on his voir dire examination that because of his moral, religious or conscientious principles and belief he would be unwilling to recommend a death penalty, even though the facts and circumstances meet the requirements of law, then he in effect has said he would be unwilling to follow the law . . . ."  App. 6.

Although the judge correctly stated the general standard for dismissal, he assured defense counsel that they were free to make an objection to any particular *Witherspoon* question that was otherwise objectionable or that had "gone too far."  *Id.*, at 7.

[3] For example, the court asked Mrs. Macy: "[D]o you hold such conscientious moral or religious principles in opposition to the death penalty that you would be unwilling under any circumstances to recommend the death sentence?"  Tr. 44.  To Mr. Varney, who responded affirmatively to the above question, the court asked further: "[I]n the event that the evidence should be such that under the law that should be the legal recommendation you would be unwilling to return such a recommendation because of your conscientious beliefs?"  *Ibid.*  When three new veniremen replaced others who had been excused, the court asked: "Do either of the three of you hold such strong religious, moral or conscientious principles in opposition to the imposition of the death penalty that you would be unwilling to vote to recommend the death penalty regardless of what the evidence was?"  *Id.*, at 88.  At a similar point later on, the court explained to replacements from the venire that "I have asked the others and I will ask each of the four of you whether you have such strong religious, conscientious or moral principles against the imposition of the death penalty that you would be unwilling to vote to return a recommended sentence of the death penalty regardless of what the evidence or the facts might be?"  *Id.*, at 109.  When one of the four expressed reservations, the court once again followed up with further questioning, demonstrating its practice of assuring itself, if there was any doubt, of the potential juror's true position. See also *id.*, at 107.  During the *voir dire* examination prior to Murphy, four potential jurors were excused on *Witherspoon* grounds.

questioning, Murphy was seated in the jury box. The court first asked Murphy his occupation, and learned that he was retired, but had spent the eight years before retirement working in the administration office of St. Pios Seminary. As previously noted, the court then asked: "Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?" After Murphy responded "Yes, I have" he was excused.

The precise wording of the question asked of Murphy, and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty. But *Witt* recognized that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." 469 U. S., at 424. The trial court, "aided as it undoubtedly was by its assessment of [the potential juror's] demeanor," *id.*, at 434, was under the obligation to determine whether Murphy's views would "'prevent or substantially impair the performance of his duties as a juror,'" *id.*, at 424. In making this determination, the trial court could take account of the fact that Murphy was present throughout an entire series of questions that made the purpose and meaning of the *Witt* inquiry absolutely clear. No specific objection was made to the excusal of Murphy by defense counsel. Nor did the court perceive, as it had previously, any need to question further. Viewing the record of *voir dire* in its entirety, we agree with the reasoning of the Court of Appeals that the trial court's decision to exclude this juror was proper. 767 F. 2d, at 754.

## IV

Petitioner next contends that the prosecution's closing argument at the guilt-innocence stage of the trial rendered his conviction fundamentally unfair and deprived the sentencing

determination of the reliability that the Eighth Amendment requires.

It is helpful as an initial matter to place these remarks in context. Closing argument came at the end of several days of trial. Because of a state procedural rule[4] petitioner's counsel had the opportunity to present the initial summation as well as a rebuttal to the prosecutors' closing arguments. The prosecutors' comments must be evaluated in light of the defense argument that preceded it, which blamed the Polk County Sheriff's Office for a lack of evidence,[5] alluded to the death penalty,[6] characterized the perpetrator of the crimes as an "animal,"[7] and contained counsel's personal opinion of the strength of the State's evidence.[8]

The prosecutors then made their closing argument. That argument deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair. Several comments attempted to place some of the blame for the crime on the

---

[4] Rule 3.250 of the Florida Rules of Criminal Procedure (1973) provided that "a defendant offering no testimony in his own behalf, except his own, shall be entitled to the concluding argument before the jury."

[5] "The Judge is going to tell you to consider the evidence or the lack of evidence. We have a lack of evidence, almost criminally negligent on the part of the Polk County Sheriff's Office in this case. You could go on and on about it." Tr. 728.

[6] "They took a coincidence and magnified that into a capital case. And they are asking you to kill a man on coincidence." *Id.*, at 730.

[7] "The first witness that you saw was Mrs. Turman, who was a pathetic figure; who worked and struggled all of her life to build what little she had, the little furniture store; and a woman who was robbed, sexually assaulted, and then had her husband slaughtered before her eyes, by what would have to be a vicious animal." *Id.*, at 717. "And this murderer ran after him, aimed again, and this poor kid with half his brains blown away. . . . It's the work of an animal, there's no doubt about it." *Id.*, at 731–732.

[8] "So they come on up here and ask Citrus County people to kill the man. You will be instructed on lesser included offenses. . . . The question is, do they have enough evidence to kill that man, enough evidence? And I honestly do not think they do." *Id.*, at 736–737.

Division of Corrections, because Darden was on weekend furlough from a prison sentence when the crime occurred.[9] Some comments implied that the death penalty would be the only guarantee against a future similar act.[10] Others incorporated the defense's use of the word "animal."[11] Prosecutor McDaniel made several offensive comments reflecting an emotional reaction to the case.[12] These comments undoubtedly were improper. But as both the District Court and the

---

[9] "As far as I am concerned, there should be another Defendant in this courtroom, one more, and that is the division of corrections, the prisons. . . . Can we expect him to stay in a prison when they go there? Can't we expect them to stay locked up once they go there? Do we know that they're going to be out on the public with guns, drinking?" App. 15–16. "Yes, there is another Defendant, but I regret that I know of no charges to place upon him, except the public condemnation of them, condemn them." *Id.*, at 16.

[10] "I will ask you to advise the Court to give him death. That's the only way that I know that he is not going to get out on the public. It's the only way I know. It's the only way I can be sure of it. It's the only way that anybody can be sure of it now, because the people that turned him loose—." *Id.*, at 17–18.

[11] "As far as I am concerned, and as Mr. Maloney said as he identified this man, this person as an animal, this animal was on the public for one reason." *Id.*, at 15.

[12] "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." *Id.*, at 16. "I wish [Mr. Turman] had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun." *Id.*, at 20. "I wish someone had walked in the back door and blown his head off at that point." *Ibid.* "He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself." *Id.*, at 28. "I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time." *Id.*, at 29. "[D]on't forget what he has done according to those witnesses, to make every attempt to change his appearance from September the 8th, 1973. The hair, the goatee, even the moustache and the weight. The only thing he hasn't done that I know of is cut his throat." *Id.*, at 31. After this, the last in a series of such comments, defense counsel objected for the first time.

original panel of the Court of Appeals (whose opinion on this issue still stands) recognized, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden* v. *Wainwright*, 699 F. 2d, at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly* v. *DeChristoforo*, 416 U. S. 637 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642.

Under this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial.[13] The prosecutors' argu-

---

[13] JUSTICE BLACKMUN's dissenting opinion argues that because of prosecutorial misconduct petitioner did not receive a fair trial. The dissent states that the Court is "willing to tolerate not only imperfection but a level of fairness and reliability so low it should make conscientious prosecutors cringe." *Post*, at 189. We agree that the argument was, and deserved to be, condemned. *Supra*, at 179. Conscientious prosecutors will recognize, however, that *every court* that criticized the argument went on to hold that the *fairness* of petitioner's trial was not affected by the prosecutors' argument.

On direct appeal in 1976, the Florida Supreme Court so held after a careful review of the "totality of the record." *Darden* v. *State*, 329 So. 2d 287, 290–291. On the first federal habeas petition, the District Court considered the prosecution's closing argument at length and denied the petition. It concluded after a "thorough review of the record" that it was "convinced that no relief is warranted." *Darden* v. *Wainwright*, 513 F. Supp. 947, 958 (MD Fla. 1981). "Darden's trial was not perfect—few are—but neither was it fundamentally unfair." *Ibid.* The original panel of the Court of Appeals affirmed the District Court's holding with respect to the prosecutors' argument. It stated that it had "considered the prosecutors' remarks and evaluated them in light of Darden's entire trial," and that it "agree[d] with the district court's conclusion that the prosecutors' comments did not deny Darden a fundamentally fair trial." 699 F. 2d 1031, 1036–1037 (1983). When the Court of Appeals reheard the case en banc

ment did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel. or the right to remain silent. See *Darden* v. *Wainwright*, 513 F. Supp., at 958. Much of the objectionable content was invited by or was responsive to the opening summation of the defense. As we explained in *United States* v. *Young*, 470 U. S. 1 (1985), the idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. *Id.*, at 13. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," 329 So. 2d, at 291, reduced the likelihood that the jury's decision was influenced by argument. Finally, defense counsel made the tactical decision not to present any witness other than petitioner. This decision not only permitted them to give their summation prior to the prosecution's closing argument, but also gave them the opportunity to make a final rebuttal argument. Defense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against peti-

---

for the second time it expressly agreed with the panel decision on the prosecutorial misconduct issue. 725 F. 2d 1526, 1532 (1984).

The Court of Appeals, however, reversed the District Court on the *Witherspoon* issue. This Court granted the State's petition for certiorari only on that issue, and vacated and remanded the case for reconsideration in light of *Wainwright* v. *Witt*, 469 U. S. 412 (1985). The Court of Appeals denied all relief, 767 F. 2d 752 (1985). During this protracted litigation not one court has agreed with petitioner's claim with respect to improper prosecutorial argument.

tioner.[14]    For these reasons, we agree with the District Court below that "Darden's trial was not perfect—few are—but neither was it fundamentally unfair."    513 F. Supp., at 958.[15]

---

[14] "Mr. McDaniel made an impassioned plea . . . how many times did he repeat [it]?    I wish you had been shot, I wish they had blown his face away.    My God, I get the impression he would like to be the man that stands there and pulls the switch on him."    Tr. 791; see also *id.*, at 794.

One of Darden's counsel testified at the habeas corpus hearing that he made the tactical decision not to object to the improper comments.    Based on his long experience with prosecutor McDaniel, he knew McDaniel would "get much more vehement in his remarks if you allowed him to go on."    By not immediately objecting, he hoped to encourage the prosecution to commit reversible error.    Supp. App. 46–47.

[15] JUSTICE BLACKMUN's dissenting opinion mistakenly argues that the Court today finds, in essence, that any error was harmless, and then criticizes the Court for not applying the harmless-error standard.    *Post*, at 196–197.    We do not decide the claim of prosecutorial misconduct on the ground that it was harmless error.    In our view of the case, that issue is not presented.    Rather, we agree with the holding of every court that has addressed the issue, that the prosecutorial argument, in the context of the facts and circumstances of this case, did not render petitioner's trial unfair—*i. e.*, that it was not constitutional error.

Petitioner also maintains that the comments violated the requirement of reliability in the sentencing process articulated in *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985).    The principles of *Caldwell* are not applicable to this case.    *Caldwell* involved comments by a prosecutor during the sentencing phase of trial to the effect that the jury's decision as to life or death was not final, that it would automatically be reviewed by the State Supreme Court, and that the jury should not be made to feel that the entire burden of the defendant's life was on them.    This Court held that such comments "presen[t] an intolerable danger that the jury will in fact choose to minimize the importance of its role," a view that would be fundamentally incompatible with the Eighth Amendment requirement that the jury make an individualized decision that death is the appropriate punishment in a specific case.    *Id.*, at 333.

There are several factual reasons for distinguishing *Caldwell* from the present case.    The comments in *Caldwell* were made at the sentencing phase of trial and were approved by the trial judge.    In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing.    The trial judge did

V

Petitioner contends that he was denied effective assistance of counsel at the sentencing phase of trial. That claim must be evaluated against the two-part test announced in *Strickland* v. *Washington,* 466 U. S. 668 (1984). First, petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.,* at 688. Second, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694. Petitioner argues that his trial counsel did not delve sufficiently into his background, and as a result were unprepared to present mitigating evidence at the sentencing hearing.

As an initial matter, petitioner contends that trial counsel devoted only the time between the close of the guilt phase of trial and the start of the penalty phase—approximately one-half hour—to preparing the case in mitigation. That argument is without merit. Defense counsel engaged in extensive preparation prior to trial, in a manner that included preparation for sentencing. Mr. Jack Johnson, head of the Public Defender's office at the time, stated to the habeas court that "we had expended hundreds of hours on [petitioner's] behalf trying to represent him," Tr. of Habeas Corpus Proceedings 219, and that his office "worked very hard on the case." *Id.,* at 237. Mr. Goodwill, an experienced criminal trial lawyer, testified that he "spent more time on this case

---

not approve of the comments, and several times instructed the jurors that the arguments were not evidence and that their decision was to be based only on the evidence. But petitioner's reliance on *Caldwell* is even more fundamentally mistaken than these factual differences indicate. *Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. In this case, none of the comments could have had the effect of misleading the jury into thinking that it had a reduced role in the sentencing process. If anything, the prosecutors' comments would have had the tendency to *increase* the jury's perception of its role. We therefore find petitioner's Eighth Amendment argument unconvincing.

than I spent on . . . any capital case I have been involved in, probably more time than any case I've ever been involved in." Supp. App. 30. That included time investigating petitioner's alibi, and driving petitioner around the scene of events to establish each point of his story. Counsel obtained a psychiatric report on petitioner, with an eye toward using it in mitigation during sentencing. Counsel also learned in pretrial preparation that Mrs. Turman was opposed to the death penalty, and considered the possibility of putting her on the stand at the sentencing phase. The record clearly indicates that a great deal of time and effort went into the defense of this case; a significant portion of that time was devoted to preparation for sentencing.

Petitioner also claims that his trial counsel interpreted Fla. Stat. § 921.141(6) (1985), a statutory list of mitigating factors, as an exclusive list. He contends that their failure to introduce any evidence in mitigation was the result of this interpretation of the statute, and that he was thereby deprived of effective assistance of counsel. We express no view about the reasonableness of that interpretation of Florida law, because in this case the trial court specifically informed petitioner and his counsel just prior to the sentencing phase of trial that they could "go into any other factors that might really be pertinent to full consideration of your case and the analysis of you and your family situation, your causes, or anything else that might be pertinent to what is the appropriate sentence." Tr. 887. At that point, even if counsel previously believed the list to be exclusive, they knew they were free to offer nonstatutory mitigating evidence, and chose not to do so.

As we recognized in *Strickland:* "Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U. S., at 689. In particular, "a court

must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Ibid.*, quoting *Michel* v. *Louisiana*, 350 U. S. 91, 101 (1955). In this case, there are several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy from petitioner himself. Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions. This evidence had not previously been admitted in evidence, and trial counsel reasonably could have viewed it as particularly damaging. The head of the Public Defenders Office testified at the habeas corpus hearing that petitioner "had been in and out of jails and prisons for most of his adult life . . . ." Tr. of Habeas Corpus Proceedings 209. Petitioner had, for example, previously been convicted of assault with intent to commit rape. *Darden* v. *State*, 218 So. 2d 485 (Fla. App. 1969). In addition, if defense counsel had attempted to offer testimony that petitioner was incapable of committing the crimes at issue here, the State could have responded with a psychiatric report that indicated that petitioner "very well could have committed the crime; that he was, as I recall his [the psychiatrist's] term, sociopathic type personality; that he would act entirely on impulse with no premeditation from the standpoint of planning. But that when a situation arose, the decision would be made simultaneously to commit the act." Supp. App. 76 (testimony of Mr. Goodwill). For that reason, after consultation with petitioner, defense counsel rejected use of the psychiatric testimony. Tr. 886. Similarly, if defense counsel had attempted to put on evidence that petitioner was a family man, they would have been faced with his admission at trial that, although still married, he was spending the weekend furlough with a girlfriend. In sum, petitioner has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered

sound trial strategy.'" 466 U. S., at 689, quoting *Michel* v. *Louisiana, supra,* at 101. Petitioner has failed to satisfy the first part of the *Strickland* test, that his trial counsels' performance fell below an objective standard of reasonableness. We agree with both the District Court and the Court of Appeals that petitioner was not deprived of the effective assistance of counsel. 699 F. 2d, at 1037.

## VI

The judgment of the Court of Appeals is affirmed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring.

I concur fully in the opinion for the Court and write separately only to address the suggestion in JUSTICE BLACKMUN's dissent that the Court rejects Darden's *Witherspoon* claim because of its "impatience with the progress of Darden's constitutional challenges to his conviction." *Post,* at 204. In support of this contention, reference is made to my dissent from the grant of certiorari in this case. The dissent states that I voted to deny the petition because Darden's claims have been reviewed by 95 judges in the 12 years since his conviction. This is simply incorrect. To set the record straight, I quote my dissent in full:

"In the 12 years since petitioner was convicted of murder and sentenced to death, the issues now raised in the petition for certiorari have been considered by this Court four times, see *Darden* v. *Florida,* 430 U. S. 704 (1977) (dismissing certiorari as improvidently granted); *Darden* v. *Wainwright,* 467 U. S. 1230 (1984) (denying certiorari); *Wainwright* v. *Darden,* 469 U. S. 1202 (1985) (vacating and remanding 725 F. 2d 1526 (CA11 1984)); *Darden* v. *Wainwright,* [473 U. S. 927] (order dated September 3, 1985, denying application for stay), and have been passed upon no fewer than 95 times by federal and

state court judges. Upon review of the petition and the history of this case, I conclude that no issues are presented that merit plenary review by this Court. Because we abuse our discretion when we accept meritless petitions presenting claims that we rejected only hours ago, I dissent." 473 U. S. 929 (1985).

As my dissent makes clear, I voted to deny the petition in this extraordinary case because the meritless claims raised did not require plenary review. Full briefing and oral argument have not changed my views.

The dissent's suggestion that this Court is motivated by impatience with Darden's constitutional claims is refuted by the record; the 13 years of judicial proceedings in this case manifest substantial care and patience. Our rejection of Darden's claims in this the fourth time he has sought review in this Court is once again based on a thoughtful application of the law to the facts of the case. At some point there must be finality.

JUSTICE BRENNAN, dissenting.

I join my Brother BLACKMUN's dissent. Moreover, adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting), I would vacate the death sentence imposed in this case.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

Although the Constitution guarantees a criminal defendant only "a fair trial [and] not a perfect one," *Lutwak* v. *United States*, 344 U. S. 604, 619 (1953); *Bruton* v. *United States*, 391 U. S. 123, 135 (1968), this Court has stressed repeatedly in the decade since *Gregg* v. *Georgia*, 428 U. S. 153 (1976), that the Eighth Amendment requires a heightened degree of reliability in any case where a State seeks to take the defend-

ant's life.[1]  Today's opinion, however, reveals a Court willing to tolerate not only imperfection but a level of fairness and reliability so low it should make conscientious prosecutors cringe.

## I

## A

The Court's discussion of Darden's claim of prosecutorial misconduct is noteworthy for its omissions.   Despite the fact that earlier this Term the Court relied heavily on standards governing the professional responsibility of defense counsel in ruling that an attorney's actions did not deprive his client of any constitutional right, see *Nix* v. *Whiteside*, 475 U. S. 157, 166–171 (1986), today it entirely ignores standards governing the professional responsibility of prosecutors in reaching the conclusion that the summations of Darden's prosecutors did not deprive him of a fair trial.   See *ante*, at 178–183.

The prosecutors' remarks in this case reflect behavior as to which "virtually all the sources speak with one voice," *Nix* v. *Whiteside*, *supra*, at 166, that is, a voice of strong condemnation.[2]  The following brief comparison of established stand-

---

[1] See, *e. g.*, *Caldwell* v. *Mississippi*, 472 U. S. 320, 328–329 (1985); *California* v. *Ramos*, 463 U. S. 992, 998–999 (1983); *Beck* v. *Alabama*, 447 U. S. 625, 637–638 (1980); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion); *Gardner* v. *Florida*, 430 U. S. 349, 358–359 (1977) (plurality opinion); *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion).

[2] Every judge who has addressed the prosecutors' behavior has condemned it.   See *Darden* v. *State*, 329 So. 2d 287, 290 (Fla. 1976) ("[T]he prosecutor's remarks under ordinary circumstances would constitute a violation of the Code of Professional Responsibility"); *id.*, at 291–295 (dissenting opinion); *Darden* v. *Wainwright*, 513 F. Supp. 947, 955 (MD Fla. 1981) ("Anyone attempting a text-book illustration of a violation of the Code of Professional Responsibility . . . could not possibly improve upon [prosecutor White's final statement]"); *Darden* v. *Wainwright*, 699 F. 2d 1031, 1035–1036 (CA11 1983); *id.*, at 1040–1043 (dissenting opinion).   Even the State's Attorney concedes that prosecutor McDaniel's summation was an "unnecessary tirade," Supp. App. 46, that "[n]o one has ever even weakly suggested that McDaniel's closing remarks were anything but

ards of prosecutorial conduct with the prosecutors' behavior in this case merely illustrates, but hardly exhausts, the scope of the misconduct involved:

improper," Supplemental Answer in *Darden* v. *Wainwright*, Case No. 79–566-Civ. T. H. (MD Fla.) (June 1, 1979), p. 12, and that much of the summation consisted of "inflammatory irrelevancies," Answer to Pet. for Habeas Corpus in *Darden* v. *Wainwright*, Case No. 79–566-Civ. T. H. (MD Fla.) (May 22, 1979), p. 11.

It is true that the Florida Supreme Court, the Federal District Court, and the Court of Appeals each ultimately concluded that Darden had not been deprived of a fair trial. But the grounds on which each rested its conclusion are troubling indeed. The Florida Supreme Court's "careful review of the 'totality of the record,'" as this Court now would describe it, *ante*, at 181, n. 13, consists of three paragraphs. The first of these discusses evidence that petitioner "was a career criminal," who stayed with a woman other than his wife while on furlough, and used her car to visit various bars and a pool hall contrary to the conditions of his furlough. The second paragraph notes, among other things, that petitioner "admitted speeding in a rainstorm and creating great danger to other motorists" on the night of the murder. And the last describes the heinousness of the events that occurred at the Turmans' store, but says absolutely nothing about the evidence tying petitioner to those events. 329 So. 2d, at 290. (The court earlier had noted that Mrs. Turman and Phillip Arnold had identified petitioner as the perpetrator. *Id.*, at 288.)

The crux of the Florida Supreme Court's analysis, however, is that it was not "possible to use language which is fair comment about these crimes without shocking the feelings of any normal person[.] The language used by the prosecutor would have possibly been reversible error if it had been used regarding a less heinous set of crimes. The law permits fair comment. This comment was fair." *Id.*, at 290. Since the prosecutors had "reasonably describ[ed] what happened and what should be done to the guilty party," their comments were not erroneous. *Id.*, at 291.

The standard apparently applied by Florida is wholly unacceptable. A defendant's right to a fair trial cannot depend on the nature of the crime of which he is accused. And "what should be done to the guilty party" cannot be relevant to the determination of guilt.

The District Court's conclusion suffers from a similar error. In addition to advancing many of the arguments adopted by the Court today—none of which is persuasive, see *infra*, at 194–200—the District Court found no prejudice because the offensive statements were not "keyed to arouse prejudice against the accused on any basis other than the horror of the crimes

1. "A lawyer shall not . . . state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused." Model Rules of Professional Conduct, Rule 3.4(e) (1984); see also Code of Professional Responsibility, DR 7–106(C)(4) (1980); ABA Standards for Criminal Justice 3–5.8(b)(2d ed. 1980). Yet one prosecutor, White, stated: "I am convinced, as convinced as I know I am standing before you today, that Willie Jasper Darden is a murderer, that he murdered Mr. Turman, that he robbed Mrs. Turman and that he shot to kill Phillip Arnold. I will be convinced of that the rest of my life." App. 15. And the other prosecutor, McDaniel, stated, with respect to Darden's testimony: "Well, let me tell you something: If I am ever over in that chair over there, facing life or death, life imprisonment or death, I guarantee you I will lie until my teeth fall out." *Id.*, at 18.

2. "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the

---

themselves." 513 F. Supp., at 956, n. 12. But at the guilt phase of this bifurcated trial, horror about the crimes was irrelevant. The sole issue was whether Darden committed them. The Court of Appeals merely quoted and approved the analysis of the District Court. See 699 F. 2d, at 1036–1037.

In its catalog of the number of judges who have found petitioner's trial to have been fair, the Court fails to include the Magistrate before whom petitioner's federal habeas proceedings were actually conducted, and who recommended that the District Court grant petitioner habeas relief on the basis of his claim of prosecutorial misconduct. Magistrate Paul Game, Jr., correctly recognized that this case essentially turned on the relative credibility of three witnesses, Mrs. Turman, Phillip Arnold, and Willie Darden, and that the prosecutors' concerted attack on Darden's humanity could well have affected the jury's assessment of his credibility. See App. 214. He also recognized that the remarks occurred "[i]n the context of the emotionally charged trial of Darden, a black man, accused of robbery, the brutal murder of a white man, the repeated shooting of a defenseless white teenager and vile sexual advances on a white woman." *Id.*, at 215. Notably, the Court today ignores the context in which the trial took place, including the fact that petitioner's motion for a change of venue was granted, and contents itself instead with hypothesizing reasons why the prosecutors' shameful conduct should not deprive them of a hanging verdict.

evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." ABA Standards for Criminal Justice 3–5.8(d) (2d ed. 1980); cf. Model Rules of Professional Conduct, Rule 3.4(e); Code of Professional Responsibility, DR 7–106(C)(7); ABA Standards for Criminal Justice 3–6.1(c) (2d ed. 1980). Yet McDaniel's argument was filled with references to Darden's status as a prisoner on furlough who "shouldn't be out of his cell unless he has a leash on him." App. 16; see also, *e. g., id.*, at 17, 18, 23, 24, 26. Again and again, he sought to put on trial an absent "defendant," the State Department of Corrections that had furloughed Darden. See, *e. g., id.*, at 15, 17, 23, 32. He also implied that defense counsel would use improper tricks to deflect the jury from the real issue. See *id.*, at 15, 26. Darden's status as a furloughed prisoner, the release policies of the Department of Corrections, and his counsel's anticipated tactics obviously had no legal relevance to the question the jury was being asked to decide: whether he had committed the robbery and murder at the Turmans' furniture store. Indeed, the State argued before this Court that McDaniel's remarks were harmless precisely *because* he "failed to discuss the issues, the weight of the evidence, or the credibility of the witnesses." Brief for Respondent 26.

3. "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." ABA Standards for Criminal Justice 3–5.8(c) (2d ed. 1980); see *Berger* v. *United States*, 295 U. S. 78, 88 (1935). Yet McDaniel repeatedly expressed a wish "that I could see [Darden] sitting here with no face, blown away by a shotgun," App. 20; see also, *e. g., id.*, at 28, 29, 31. Indeed, I do not think McDaniel's summation, taken as a whole, can accurately be described as anything but a relentless and single-minded attempt to inflame the jury.

## B

The Court, see *ante*, at 181, relies on the standard established in *Donnelly* v. *DeChristoforo*, 416 U. S. 637, 643 (1974), for deciding when a prosecutor's comments at a state trial render that trial fundamentally unfair. It omits, however, any discussion of the facts, so different from those in this case, that led the Court to conclude in *DeChristoforo* that that defendant had not been deprived of a fair trial.

*DeChristoforo* concerned "two remarks made by the prosecutor during the course of his rather lengthy closing argument to the jury." *Id.*, at 640. One remark was "but one moment of an extended trial." *Id.*, at 645. And even the more objectionable remark was so "ambiguous," *ibid.*, that it provided no basis for inferring either that the prosecutor "intend[ed] [it] to have its most damaging meaning or that a jury, sitting through lengthy exhortation, [would] draw that meaning from the plethora of less damaging interpretations," *id.*, at 647. Finally, the trial judge in *DeChristoforo* expressly instructed the jury to disregard the improper statements. *Id.*, at 645. This Court's holding thus rested on its conclusion that the prosecutor's comments were neither so extensive nor so improper as to violate the Constitution.

Far from involving "ambiguous" statements that "might or might not" affect the jury, *id.*, at 647, the remarks at issue here were "focused, unambiguous, and strong." *Caldwell* v. *Mississippi*, 472 U. S. 320, 340 (1985). It is impossible to read the transcript of McDaniel's summation without seeing it as a calculated and sustained attempt to inflame the jury. Almost every page contains at least one offensive or improper statement; some pages contain little else. The misconduct here was not "slight or confined to a single instance, but . . . was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger* v. *United States*, 295 U. S., at 89.

C

The Court presents what is, for me, an entirely unpersuasive one-page laundry list of reasons for ignoring this blatant misconduct. First, the Court says that the summations "did not manipulate or misstate the evidence [or] . . . implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Ante*, at 182. With all respect, that observation is quite beside the point. The "solemn purpose of endeavoring to ascertain the truth . . . is the *sine qua non* of a fair trial," *Estes* v. *Texas*, 381 U. S. 532, 540 (1965), and the summations cut to the very heart of the Due Process Clause by diverting the jury's attention "from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding." *Stone* v. *Powell*, 428 U. S. 465, 490 (1976).

Second, the Court says that "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense." *Ante*, at 182, citing *United States* v. *Young*, 470 U. S. 1 (1985). The Court identifies four portions of the defense summation that it thinks somehow "invited" McDaniel's sustained barrage. The State, however, did not object to any of these statements, and, to my mind, none of them is so objectionable that it would have justified a tactical decision to interrupt the defense summation and perhaps irritate the jury. Cf. *id.*, at 13–14.

The Court begins by stating that defense counsel "blamed" the Sheriff's Office for a lack of evidence. *Ante*, at 179. The Court does not identify which, if any, of McDaniel's remarks represented a response to this statement. I cannot believe that the Court is suggesting, for example, that defense counsel's one mention of the "almost crimina[l] negligen[ce] on the part of the Polk County Sheriff's Office," Tr. 728, justified McDaniel's express and repeated wish that he could try the Department of Corrections for murder. See, *e. g.*, App. 15, 17, 23, 32.

Next, the Court notes that defense counsel "alluded" to the death penalty. *Ante,* at 179. While this allusion might have justified McDaniel's statement that "you are merely to determine his innocence or guilt, nothing else," App. 17, it could hardly justify, for example, McDaniel's expressions of his personal wish that Darden be "blown away by a shotgun," *id.,* at 20; see also *id.,* at 28, 29, 31.

Moreover, the Court says, defense counsel twice referred to the perpetrator as an "animal." *Ante,* at 179; see Tr. 717, 732. It is entirely unclear to me why this characterization called for any response from the prosecutor at all. Taken in context, defense counsel's statements did nothing more than tell the jury that, although everyone agreed that a heinous crime had been committed, the issue on which it should focus was whether *Darden* had committed it.

Finally, the Court finds that Darden brought upon himself McDaniel's tirade because defense counsel gave his "personal opinion of the strength of the State's evidence." *Ante,* at 179. Again, the Court gives no explanation of how the statement it quotes — a single, mild expression of defense counsel's overall assessment of the evidence — justified the "response" that followed, which consisted, to the extent it represented a comment on the evidence at all, of accusations of perjury, see App. 18–19, and personal disparagements of opposing counsel, see *id.,* at 15, 26. In sum, McDaniel went so far beyond "respond[ing] substantially in order to 'right the scale,'" *Young,* 470 U. S., at 13, that the reasoning in *Young* provides no basis at all for the Court's holding today.

The third reason the Court gives for discounting the effects of the improper summations is the supposed curative effect of the trial judge's instructions: the judge had instructed the jury that it was to decide the case on the evidence and that the arguments of counsel were not evidence. *Ante,* at 182. But the trial court overruled Darden's objection to McDaniel's repeated expressions of his wish that Darden had been killed, App. 31, thus perhaps leaving the jury with the

impression that McDaniel's comments were somehow relevant to the question before them. The trial judge's instruction that the attorneys were "trained in the law," and thus that their "analysis of the issues" could be "extremely helpful," Tr. 714, might also have suggested to the jury that the substance of McDaniel's tirade was pertinent to their deliberations.

Fourth, the Court suggests that because Darden enjoyed the tactical advantage of having the last summation, he was able to "tur[n] much of the prosecutors' closing argument against them." *Ante*, at 182. But the issue before the jury was whether Darden was guilty, not whether McDaniel's summation was proper. And the question before this Court is not whether we agree with defense counsel's criticism of the summation but whether the jury was affected by it. Since Darden was ultimately convicted, it is hard to see what basis the Court has for its naked assertion that "[d]efense counsel were able to use the opportunity for rebuttal very effectively." *Ibid.;* cf. *Young,* 470 U. S., at 18, n. 15 (the defendant's acquittal of the most serious charge "reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly").

Fifth, the Court finds, in essence, that any error was harmless: "The weight of the evidence against petitioner was heavy; the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges,' 329 So. 2d, at 291, reduced the likelihood that the jury's decision was influenced by argument." *Ante*, at 182. The Court rejects the "no effect" test set out in *Caldwell* v. *Mississippi,* 472 U. S. 320 (1985), see *ante*, at 183, n. 14, but it does not identify the standard it does use to decide the harmlessness of the error.[3]

---

[3] The Court finds *Caldwell* inapposite because the offending comment in *Caldwell* occurred at the sentencing stage of the defendant's trial and misled the jury as to its role in the sentencing process. *Ante*, at 183, n. 14. But *Caldwell*'s Eighth Amendment underpinnings clearly extend to guilt

Every harmless-error standard that this Court has employed, however, shares two salient features.  First, once serious error has been identified, the burden shifts to the beneficiary of the error to show that the conviction was not tainted.  Second, although different formulations of the harmless-error standard differ in the level of confidence in the outcome required to overcome that burden, the question before a reviewing court is never whether the evidence would have been sufficient to justify conviction, absent an error, but, rather, whether the error undermines its confidence in the outcome of the proceeding to an unacceptable degree.  See, *e. g.*, *United States* v. *Young*, 470 U. S., at 20; *Chapman* v. *California*, 386 U. S. 18, 24 (1967); *Kotteakos* v. *United States*, 328 U. S. 750, 765 (1946).

Regardless of which test is used, I simply do not believe the evidence in this case was so overwhelming that this Court can conclude, on the basis of the written record before it, that the jury's verdict was not the product of the prosecutors' misconduct.  The three most damaging pieces of evidence—the identifications of Darden by Phillip Arnold and Helen Turman and the ballistics evidence—are all sufficiently problematic that they leave me unconvinced that a jury not exposed to McDaniel's egregious summation would necessarily have convicted Darden.

---

determinations in capital cases as well as to sentencing.  *Beck* v. *Alabama*, 447 U. S., at 637–638.  And under the circumstances of this case, where the sentencing hearing followed immediately upon the jury's return of a guilty verdict and the State's summation consisted of less than a full page of transcript, see Tr. 894, I think the State must have assumed that its attacks on the Department of Corrections and repeatedly expressed wish that Darden die would affect the jury's sentencing decision as well as its determination of guilt.  Indeed, the District Court found that the summations during the guilt phase were "in effect [the State's] principal argument in support of the death penalty."  513 F. Supp., at 953, and n. 10. Moreover, I do not see why misleading a jury as to the relevant issues in a capital trial is somehow less pernicious than misleading a jury as to its role.

Arnold first identified Darden in a photo array shown to him in the hospital. The trial court suppressed that out-of-court identification following a long argument concerning the reliability and constitutionality of the procedures by which it was obtained. See Tr. 487–488.[4]

Mrs. Turman's initial identification was made under even more suggestive circumstances. She testified at trial that she was taken to a preliminary hearing at which Darden appeared in order "[t]o identify him." *Id.*, at 215. Instead of being asked to view Darden in a lineup, Mrs. Turman was brought into the courtroom, where Darden apparently was the only black man present. See *id.*, at 220–221. Over defense counsel's objection, after the prosecutor asked her whether "this man sitting here" was "the man that shot your husband," *ibid.*, she identified Darden.[5] Cf. *Moore* v. *Illinois*, 434 U. S. 220, 229–230 (1977).

---

[4] Of the six photographs in the array, Arnold immediately rejected four because "[t]hey just didn't fit the description" he had earlier given the police. Tr. 457. Darden's photograph was one of no more than two that identified the subject by name, and under the name on Darden's photograph was the notation "Sheriff's Department, Bartow, Florida" and the date "9/9/73." *Id.*, at 476–477. Arnold was aware at the time of the identification on September 11 that a suspect recently had been arrested. *Id.*, at 459.

[5] Mrs. Turman's identification took place after the following colloquy between the court, the prosecutor (Mr. Mars), and the defense attorney (Mr. Hill):

"THE COURT: Ask her to identify.

"MR. MARS: Yes, sir.

"Q: Can you see this man sitting here?

"MR. HILL: Your Honor, I am going to object to that type of identification.

"THE COURT: I am not. Sit down.

"MR. HILL: Judge—

"THE COURT: Not under these circumstances, Mr. Hill.

"MR. HILL: Judge, even as a defense attorney, that shows no respect in court, much less for the Court, and I—

"THE COURT: I appreciate—

"MR. HILL: And the objection, I want on the record.

The use of showups has long been condemned by this Court, precisely because they can result in unreliable identifications. See, *e. g., Stovall* v. *Denno,* 388 U. S. 293, 302 (1967). Similarly, the Court has condemned the use of photo arrays in which the suspect's photograph "is in some way emphasized." *Simmons* v. *United States,* 390 U. S. 377, 383 (1968). While the question whether the various in- and out-of-court identifications ought to have been suppressed is not now before the Court,[6] my confidence in their reliability is nonetheless undermined by the suggestiveness of the procedures by which they were obtained, particularly in light of Mrs. Turman's earlier difficulties in describing the criminal.

Finally, the ballistics evidence is hardly overwhelming. The purported murder weapon was tied conclusively neither to the crime nor to Darden. Special Agent Cunningham of the Federal Bureau of Investigation's Firearms Identification Unit testified that the bullets recovered at the scene of the crime "could have been fired" from the gun, but he was unwilling to say that they in fact had come from that weapon.

---

"THE COURT: I appreciate that. It's on the record. This woman has had a traumatic experience and she—
"MR. HILL: Judge, I appreciate that. I still have an obligation to my client.
"THE COURT: I appreciate that. Now if you want to be held in contempt, you pardon me. Alright, go ahead.
"Q: Is this the man that shot your husband?
"A: Yes, sir."
See Pet. for Habeas Corpus in *Darden* v. *Wainwright,* Case No. 79–566-Civ. T. H. (MD Fla.) (May 21, 1979), pp. 18–19; Tr. 218–219.

[6] Challenges to the admissibility of the various identifications were presented in Darden's petition to this Court for direct review of his conviction and sentence. See Brief for Petitioner in *Darden* v. *Florida,* O. T. 1976, No. 76–5382, pp. 2–3 (second and third questions presented raising issues concerning the witnesses' identifications). Although that petition for certiorari was granted, 429 U. S. 917 (1976), the Court later limited its grant to the issue of the prosecutor's closing argument, 429 U. S. 1036 (1977), and ultimately dismissed the writ as improvidently granted, 430 U. S. 704 (1977).

Tr. 347, 357. He also testified, contrary to the Court's assertion, that rebored Smith & Wessons were fairly common. See *id.*, at 350–351, 357–358. Deputy Sheriff Weatherford testified that the gun was discovered in a roadside ditch adjacent to where Darden had wrecked his car on the evening of the crime. But the gun was discovered the next day, *id.*, at 503, and the ditch was also next to a bar's parking lot. *Id.*, at 531.

Darden testified at trial on his own behalf and denied any involvement in the robbery and murder. See *id.*, at 571–660. His account of his actions on the day of the crime was contradicted only by Mrs. Turman's and Arnold's identifications. Indeed, a number of the State's witnesses corroborated parts of Darden's account. The trial judge who had seen and heard Darden testify found that he "emotionally and with what appeared on its face to be sincerity, proclaimed his innocence." App. 34. In setting sentence, he viewed the fact that Darden "repeatedly professed his complete innocence of the charges" as a mitigating factor. *Id.*, at 35.

Thus, at bottom, this case rests on the jury's determination of the credibility of three witnesses — Helen Turman and Phillip Arnold, on the one side, and Willie Darden, on the other. I cannot conclude that McDaniel's sustained assault on Darden's very humanity did not affect the jury's ability to judge the credibility question on the real evidence before it. Because I believe that he did not have a trial that was fair, I would reverse Darden's conviction; I would not allow him to go to his death until he has been convicted at a fair trial.

## II

Even if Darden had been convicted fairly, however, I believe his death sentence should be vacated because of the improper exclusion for cause of a member of the venire who was qualified to serve under this Court's decisions in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), and *Wainwright* v. *Witt*, 469 U. S. 412 (1985). In *Davis* v. *Georgia*, 429 U. S. 122 (1976),

the Court held that the improper exclusion of one juror renders a death sentence constitutionally infirm *per se.* In Darden's case, the potential prejudice is palpable. Even though it was stripped of members expressing reservations about the death penalty, this jury could not agree unanimously that a death sentence was appropriate. See Tr. 908; 699 F. 2d, at 1041 (dissenting opinion).

*Witherspoon* concerned an Illinois statute that excused for cause "'any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same.'" 391 U. S., at 512, quoting Ill. Rev. Stat., ch. 38, § 743 (1959). The Court held that the Constitution barred the execution of a defendant sentenced to death by a jury from which such persons had been excluded for cause. That holding rested in large part on the Court's recognition that even some jurors who oppose the death penalty can set aside their personal beliefs and follow the court's instructions to consider whether death is an appropriate penalty. See 391 U. S., at 514–515, n. 7, 515–516, n. 9, 519, 520. As recently as last Term, we held once again that trial courts must distinguish between "prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial." *Witt,* 469 U. S., at 421; see also *id.,* at 422, n. 4; *Adams* v. *Texas,* 448 U. S. 38, 44–45 (1980); *Boulden* v. *Holman,* 394 U. S. 478, 483–484 (1969).

The Court's discussion of Darden's claim rests on a premise that the claim depends entirely on the wording of a single question asked by the trial judge prior to the exclusion of venire member Murphy. See *ante,* at 176. That premise is mistaken. The trial court's error lay in its misunderstanding of the proper standard for exclusion under *Witherspoon.* This misunderstanding influenced both the question the court

asked Murphy and its evaluation of his answer. On this record, I cannot say with any assurance that Murphy was properly excluded.

Prior to the *voir dire* of individual venire members, the trial judge announced his intention to excuse, not only any potential juror whose religious or moral principles made him unable to impose the death penalty, but also any potential juror who, if he did follow the court's instructions, "would be going against his principles" (emphasis deleted). App. 6.[7] This standard is essentially indistinguishable from the standard employed by Illinois and expressly disapproved by this Court in *Witherspoon*. If a juror who has reservations about the wisdom or morality of the death penalty nonetheless follows the court's instructions, he has *not* been "'prevent[ed] or substantially impair[ed in] the performance of his duties as

---

[7] In denying Darden's pretrial motion to limit *voir dire* concerning jurors' attitudes towards the death penalty, the trial court stated:

"It is my ruling if a prospective juror states on his voir dire examination that because of his moral, religious or conscientious principles and belief he would be unwilling to recommend a death penalty, even though the facts and circumstances meet the requirements of law, then he in effect has said he would be unwilling to follow the law the court shall charge upon it and disregard and be unwilling to follow it or if he did follow it, it would be going against his principles, and therefore, I would rule that would be disqualification. If that exists, I intend to disqualify for cause." App. 6 (emphasis deleted).

The Court's statement that "the judge correctly stated the general standard for dismissal," *ante*, at 177, n. 2, comes immediately on the heels of a truncated quotation of the trial judge's ruling which omits the critical phrase, "if he did follow it, it would be going against his principles, and therefore, I would rule that would be disqualification."

The court gave petitioner a continuing objection to its proposed *voir dire* questioning. App. 7. Even if this continuing objection were not enough standing alone to preserve petitioner's claim—and the Court does not so hold—the statement that "[n]o specific objection was made to the excusal of Murphy by defense counsel," *ante*, at 178, is flatly contradicted by the trial transcript. Immediately following Murphy's excusal, the court directed the stenographer to "note the defendant's object to him being excused for cause." Tr. 165.

a juror in accordance with his instructions and his oath,'"
*Witt*, 469 U. S., at 424, quoting *Adams*, 448 U. S., at 45.   To
permit only those individuals who have no reservations about
exercising "the truly awesome responsibility of decreeing
death for a fellow human," *McGautha* v. *California*, 402
U. S. 183, 208 (1971), to serve on capital juries would surely
mark a return to the empaneling of juries "uncommonly will-
ing to condemn a man to die," *Witherspoon*, 391 U. S., at 521.

This case is thus entirely unlike *Witt*.   *Witt*'s statement
that determinations of juror bias cannot be reduced to a cate-
chism, 469 U. S., at 424, and its reliance on the peculiar abil-
ity of trial judges to observe the demeanor and credibility of
potential jurors, *id.*, at 428, make sense when there is "every
indication that the judge . . . applied the correct standard."
*Id.*, at 431.   But the record before us today provides no such
indication.   It is impossible to determine whether the judge's
finding of bias reflected a belief that Murphy would be unable
to follow the court's instructions or a belief that Murphy
would have to set aside his personal beliefs to do so.   In fact,
Murphy never gave any indication that he could not follow
the court's instructions.   The burden of proving Murphy's
bias rested on the State.   *Id.*, at 423–424.   The Court's
present heavy reliance on "the context surrounding Murphy's
exclusion," *ante*, at 176, simply cannot support its conclusion
because the trial court's improper interpretation of *Wither-
spoon* infected that context.

The Court's statement that "the trial court could take ac-
count of the fact that Murphy was present throughout an en-
tire series of questions that made the purpose and meaning of
the *Witt* inquiry absolutely clear," *ante*, at 178, suffers from a
similar defect.[8]   I find implausible the Court's assumption

---

[8] Even to refer to the "*Witt* inquiry" reflects inattention to chronology.
This case was tried about a dozen years before *Witt* sought to dispel the
"general confusion surrounding the application of *Witherspoon*" under
which courts across the country had labored for 15 years.   469 U. S., at
418.   How the purpose and meaning of *Witt* could be clear to a layman like

that Murphy followed closely the daylong questioning of other jurors. But if that assumption were correct, then the Court should also assume that Murphy anticipated being asked whether his beliefs would prevent or substantially impair performance of his duties as a juror, as other jurors expressing similar sentiments had been asked. That three other jurors, under somewhat more extensive questioning, explicitly stated that *they* did not think *they* could vote for the death penalty, see Tr. 44 (juror Varney); *id.*, at 107 (juror Carn); *id.*, at 109–110 (juror Maher), says nothing about whether *Murphy* shared their inability to put aside personal beliefs and obey his oath as a juror. *Witt* may be right that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear,'" 469 U. S., at 424–425; here, however, the judge did not even ask the one question that might have given him real insight into Murphy's ability to serve. The wrong answer is what no question at all begets. Cf. A. Bickel, The Least Dangerous Branch 103 (1962).

A close reading of the lengthy *voir dire* transcript leads me to conclude that the trial court's behavior is more easily explained by Murphy's appearance in the jury box at the end of a long day of questioning and the desire to finish jury selection expeditiously than by any definite impression on the part of the trial judge that Murphy was unqualified. But neither the trial court's eagerness to get the trial started, nor this Court's impatience with the progress of Darden's constitutional challenges to his conviction and death sentence, see, *e. g.*, 473 U. S. 928, 929 (1985) (BURGER, C. J., dissenting

---

Murphy when they were unclear to the judge trying this case and to federal and state appellate courts is nowhere explained. Moreover, from Murphy's perspective, the purpose of the inquiry was to obtain from him truthful answers regarding his background and beliefs. His oath as a juror required him to reveal his strong feelings about the death penalty, even if he believed that he could follow the judge's instructions notwithstanding those feelings.

from the grant of certiorari because 12 years had elapsed since Darden's conviction and sentence and no fewer than "95" judges had reviewed the case),[9] renders Murphy's exclusion justifiable or harmless.

## III

Twice during the past year—in *United States* v. *Young*, 470 U. S. 1 (1985), and again today—this Court has been faced with clearly improper prosecutorial misconduct during summations. Each time, the Court has condemned the behavior but affirmed the conviction. Forty years ago, Judge Jerome N. Frank, in dissent, discussed the Second Circuit's similar approach in language we would do well to remember today:

"This court has several times used vigorous language in denouncing government counsel for such conduct as

_____

[9] A public dissent from a grant of certiorari is extremely rare. Indeed, I know of no other recent case in which a Justice has dissented on the ground that the claims raised by the petitioner—which at least four Justices must have found worthy of full consideration—were meritless. See also *Ohio ex rel. Eaton* v. *Price*, 360 U. S. 246, 247, n. 1 (1959) (memorandum of BRENNAN, J.) (finding only one instance of such a dissent—the extraordinary case of *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 937 (1952), where certiorari was granted prior to the Court of Appeals' judgment). The concurrence filed by THE CHIEF JUSTICE today, see *ante*, p. 187, to justify his dissent from the grant of certiorari in this case shows why. As JUSTICE BRENNAN persuasively explained in *Price*, a public dissent from a grant of certiorari poses dangers both to the actual workings of the adjudicatory process and to public respect for that process. 360 U. S., at 247–248. By reprinting his dissent in its entirety and emphasizing once again the number of times this Court has been asked to review Darden's claims, THE CHIEF JUSTICE suggests that he irrevocably had committed himself to rejecting those claims before he had received the benefit of the full briefing, oral argument, access to the record, and discussion of the issues by other Members of the Court that followed our grant of certiorari. To me, the fact that this Court has granted certiorari three times is hardly a reason for concluding Darden's claims are meritless, or that the undoubted interest in finality should outweigh our duty to ensure that Darden receives due process.

that of the [prosecutor] here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, 'Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of "disapproved" remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial.' Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary" (footnote omitted). *United States* v. *Antonelli Fireworks Co.*, 155 F. 2d 631, 661, cert. denied, 329 U. S. 742 (1946).

I believe this Court must do more than wring its hands when a State uses improper legal standards to select juries in capital cases and permits prosecutors to pervert the adversary process. I therefore dissent.