OPINION
{¶ 1} On September 17, 2004, the Richland County Grand Jury indicted appellant, Shane Riggenbach, on one count of aggravated arson in violation of R.C. 2909.02. Said charge arose from a fire at the home of Kerry Snyder.
 {¶ 2} A jury trial commenced on June 30, 2005. The jury found appellant guilty as charged. By sentencing entry filed July 7, 2005, the trial court sentenced appellant to eight years in prison.
 {¶ 3} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 I {¶ 4} "APPELLANT'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE PROSECUTOR SOLICITED TESTIMONY FROM TWO TRIAL WITNESSES REGARDING APPELLANT'S ASSERTION OF HIS RIGHT TO REMAIN SILENT WHEN QUESTIONED BY FIRE INVESTIGATORS AND TOLD THE JURY DURING CLOSING ARGUMENT THAT OHIO LAW ALLOWS THEM TO DRAW AN INFERENCE OF GUILT FROM HIS SILENCE. THIS IS IN DEROGATION OF RIGHTS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND BY ARTICLE 1 SECTION 2, 10 AND 16 OF THE OHIO CONSTITUTION."
 II {¶ 5} "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND BY ARTICLE 1 SECTION 2, 10, AND 16 OF THE OHIO CONSTITUTION, DUE TO ACTS AND OMISSIONS CONCERNING WITNESS TESTIMONY AND PROSECUTOR COMMENTS DURING CLOSING ARGUMENT REGARDING APPELLANT'S CHOICE NOT TO ANSWER INVESTIGATOR'S QUESTIONS WHILE IN CUSTODY."
 III {¶ 6} "THE DUE PROCESS VIOLATIONS IN APPELLANT'S TRIAL CONSTITUTE PLAIN ERROR."
 I, II, III {¶ 7} Appellant claims error in testimony elicited during trial regarding his right to remain silent after Miranda
warnings were given. Appellant claims prosecutorial misconduct, ineffective assistance of counsel and plain error. Because each assignment involves an analysis of the same testimony and statements, we will address them jointly.
 {¶ 8} The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. State v. Lott (1990),51 Ohio St.3d 160, certiorari denied (1990), 112 L.Ed.2d 596. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial. Darden v. Wainwright (1986), 477 U.S. 168.
 {¶ 9} The test for ineffective assistance of counsel is set forth in State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, certiorari denied (1990),497 U.S. 1011. Appellant must establish the following:
 {¶ 10} "2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; Strickland v. Washington [1984],466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)
 {¶ 11} "3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."
 {¶ 12} An error not raised in the trial court must be plain error for an appellate court to reverse. State v. Long (1978),53 Ohio St.2d 91; Crim.R. 52(B). In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. Long. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus.
 {¶ 13} Appellant argues the testimony of Captain Amy McElvain and Fire Investigator Kurt Schneider violated his due process rights because they commented on his post-Miranda silence. The complained of testimony regarding Captain McElvain occurred on direct and was as follows:
 {¶ 14} "Q. Okay. Did you want to talk to him [appellant] about his involvement in this fire?
 {¶ 15} "A. Yes, I did want to talk to him.
 {¶ 16} "Q. And did you first read him his Miranda rights?
 {¶ 17} "A. Yes.
 {¶ 18} "Q. Was he willing to talk to you?
 {¶ 19} "A. No, he was not.
 {¶ 20} "Q. Did he have any conversation with you whatsoever?
 {¶ 21} "A. He told me that he knew that I could get him out of jail. He was in the city jail at the time that I did talk to him. He stated that he knew I could get him out of jail, and that he would not talk to me unless I did get him out of jail. He also told me if I got him out of jail he would go to Jamaica and I would have to extradite him." T. at 1141-15.
 {¶ 22} Defense counsel during cross-examination questioned Captain McElvain on the same issues:
 {¶ 23} "Q. I think Mr. Robinson asked you a question about, something about whether he wanted to talk to you or talked to you? Did Mr. Robinson ask you a question similar to that?
 {¶ 24} "A. On whether Mr. Riggenbach wanted to talk to me?
 {¶ 25} "Q. Uh huh.
 {¶ 26} "A. I wanted to talk to him. That was why I went to the jail. He did not request to talk to me.
 {¶ 27} "Q. He had no obligation to talk to you, did he?
 {¶ 28} "A. Oh, no.
 {¶ 29} "* * *
 {¶ 30} "Q. And this is a summary of your report after you visited with him?
 {¶ 31} "A. Yes.
 {¶ 32} "Q. Then he told you he wouldn't speak to you as long as he was incarcerated also, right?
 {¶ 33} "A. Yes." T. at 127 and 129, respectively.
 {¶ 34} On direct, Fire Investigator Schneider testified about appellant's arrest and a conversation he had with appellant:
 {¶ 35} "Q. Did you try to have a conversation with Mr. Riggenbach, the defendant?
 {¶ 36} "A. I actually did have a conversation with him.
 {¶ 37} "Q. Did you give him his Miranda warnings before you had your conversation with him?
 {¶ 38} "A. Yes, I reminded him of his Miranda warnings that the police had already read him that day.
 {¶ 39} "Q. He is the same Mr. Riggenbach that is present in the courtroom?
 {¶ 40} "A. He is.
 {¶ 41} "Q. And what did he tell you, or what was the nature of the conversation between you and the defendant that you had on July 14, 2004?
 {¶ 42} "A. The initial conversation started just by general conversation. We had a nice little chit-chat and I asked him if he had gotten a warrant, or if he had any questions for me, or if he didn't understand anything I would be more than happy to explain to him why he was in jail, at which point he reminded me he had a copy of my statement of facts and he read it and he really didn't understand what this was all about. And then he reminded me that he thought originally this was about a fire that happened somewhere else.
 {¶ 43} "Q. What happened next, what did you talk about next?
 {¶ 44} "A. I said, you know, do you want to talk to me? Do you want to answer some questions? And he said, you know, he wasn't really sure if he wanted to answer them right at this time. Then he showed me the shackles that were on his arms, because he comes up from the jail with shackles and stuff on. I asked him, you know, if I take off those shackles and get him a glass of water, if he would talk to me. He said, well, we'll see. I had his handcuffs taken off, left his leg shackles on actually, and got him a glass of water, and he sat down again, and real politely I told him you certainly don't have to answer any of my questions, let's have a nice conversation and figure out what happened. All I'm looking for is the truth. I just want to know what happened. Here's your opportunity, you tell me everything that happened that night so that I don't make any unjust inferences on why you did what you did.
 {¶ 45} "Q. Were you trying to determine or get him to admit his intent on setting this fire?
 {¶ 46} "A. Yes, I was.
 {¶ 47} "Q. What was the purpose of that?
 {¶ 48} "A. I wanted to make sure that his intent was either, A, to scare this guy. He apparently had some run-ins with him over time, bad business dealings, or he had had some things stolen from him through various conversations with some of the witnesses. Or I wanted to see that he was really mad at this guy and his intent was to kill him. So I asked him those questions.
 {¶ 49} "Q. And what was his response?
 {¶ 50} "A. He didn't respond.
 {¶ 51} "Q. He didn't give you any answer when you asked him that?
 {¶ 52} "A. No.
 {¶ 53} "Q. Just stared at you?
 {¶ 54} "A. He just sat there." T. at 254-256.
 {¶ 55} Because no objections were made and because appellant claims his trial counsel was ineffective for failing to object, we must examine each exchange under State v. Leach,102 Ohio St.3d 145, 2004-Ohio-2147, wherein the Supreme Court of Ohio at ¶ 16 and 17 stated the following:
 {¶ 56} "In Doyle v. Ohio (1976), 426 U.S. 610, 618,96 S.Ct. 2240, 49 L.Ed.2d 91, the United States Supreme Court held that use of a defendant's post-arrest, post-Miranda silence forimpeachment purposes violates the Due Process Clause of theFourteenth Amendment because although `the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.' Id. Further, the court held that `every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.' Id.
 {¶ 57} "Ten years later, when confronted with the issue of whether a defendant's post-arrest, post-Miranda silence was admissible as substantive evidence of guilt in the state's case-in-chief, the court held that such use violated due process, noting that `breaching the implied assurance of the Miranda
warnings is an affront to the fundamental fairness that the Due Process Clause requires.' Greenfield [Wainwright v.], 474 U.S. [284] at 291, 106 S.Ct. 634, 88 L.Ed.2d 623." (Emphasissic.)
 {¶ 58} Both of the conversations with appellant occurred post-arrest and post-Miranda warnings. The purpose of the complained of exchanges during trial was not for impeachment purposes therefore, we do not find a clear and unambiguous violation of Doyle. The gravamen of this due process issue is whether the post-arrest, post-Miranda silence was used by the state as substantive evidence of guilt.
 {¶ 59} The state attempts to justify the exchanges as mere explanation for the course of the investigation. We might accept this argument if appellant had not already been placed under arrest and in particular, if the questions were not the last series of questions asked during Captain McElvain's direct testimony. However, appellant did talk to Captain McElvain after his initial refusal and it is this conversation, as evidence of possible flight, that was the reason for the continued questioning.
 {¶ 60} The exchange with Fire Investigator Schneider is not about appellant's post-Miranda silence, but about appellant's negotiations with Mr. Schneider and his willingness to talk if the shackles were removed. It is his eventual silence that comes into the record. We find it was not offered as substantive evidence of guilt and did not violate Doyle and its progeny. We therefore conclude neither testimony was offered as substantive proof of guilt.
 {¶ 61} Appellant argues the prosecutor improperly commented on his silence as an indicia of guilt as one of the "top ten reasons" to find appellant guilty:
 {¶ 62} "Finally, in the law we have a concept called admission by silence. When Kurt asked him point blank what was your intent when you set the fire? Were you trying to kill Kerry Snyder and his wife, or were you just trying to scare them, or what were you trying to do? He doesn't say a peep. He just sits there and looks at you. And yet under Ohio law there can be things called admission by silence where if a normal person would deny something like that, a person who hadn't committed the crime and was confronted like that, they would say I don't know what you are talking about. I didn't set the fire." T at 288-289.
 {¶ 63} There can be no doubt this commentary violated appellant's due process right to remain silent. The trial court immediately stopped the prosecutor and instructed the jury as follows:
 {¶ 64} "THE COURT: Just a minute here. You are not permitted to comment on a person's silence. If he's refusing to testify, that's something that is his Constitutional right. So don't convict somebody because he was silent, folks. You need to understand, the evidence has to be there that he did the crime. Silence, as I told you at the start, is not an admission, and that's his right, to refuse to respond.
 {¶ 65} "MR. ROBINSON: I'm not talking about the fact of him testifying or not testifying. I'm not talking about that. I'm talking about when he was interviewed by the officer.
 {¶ 66} "MR. WHITNEY: Objection.
 {¶ 67} "THE COURT: But when he was interviewed by the officer he was given his Miranda rights and was told he had the right to remain silent, that's his Constitutional right, so he's permitted to do that. That is not a legitimate basis to infer guilt.
 {¶ 68} "MR. ROBINSON: Okay. Ignore that one, that one doesn't count.
 {¶ 69} "THE COURT: I'm instructing you to ignore that." T. at 289-290.
 {¶ 70} Appellant also argues his trial counsel was ineffective in not moving for a mistrial based upon the cited exchanges.
 {¶ 71} Clearly the prosecutor's comments were improper. The prosecutor's comments compounded the issue and we can only assume the jury heard the prosecutor's inability to comprehend the issue. We concur defense counsel's failure to move for a mistrial was error. Our next analysis is whether the improper comments "prejudicially affected the substantial rights of the accused" and whether "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."
 {¶ 72} First, it is important to note the trial court's curative instruction was correct and prior to trial and in the final jury instructions, the trial court in general instructions reminded the jury of appellant's constitutional right to remain silent. T. at 16, 315. A jury is presumed to follow the curative instructions of the trial court. State v. Loza (1994),71 Ohio St.3d 61.
 {¶ 73} Second, we find there was overwhelming evidence of appellant's guilt. Appellant was identified by a neighbor, Dalice Stankiewicz, as the individual who set the fire. T. at 217-219, 221-223. The identification was substantiated by appellant's friends, Korie Welch and Keri Howe, who testified they drove with appellant to the scene of the fire at the time of the fire, and as they drove away, appellant discarded his outer layer of clothing out the vehicle's window. T. at 173-174, 187-190. Appellant was shaking, out of breath and admitted to starting the fire. T at 174-175, 191.
 {¶ 74} Upon review, we conclude the prosecutor's comments did not prejudicially affect appellant's substantial rights and the result of the trial would not have been different.
 {¶ 75} Assignments of Error I, II and III are denied.
 {¶ 76} The judgment of the Court of Common Pleas of Richland County, Ohio is hereby affirmed.
Farmer, J. Boggins, P.J. concur and Hoffman, J. concurs separately.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio is affirmed.